**UNITED STATES, Appellee,**

v.

**Stephan SELLERS, Airman First Class, U.S. Air Force, Appellant.**

No. 64,351.
ACM 28115.

U.S. Court of Military Appeals.

Argued Nov. 28, 1990.

Decided Sept. 30, 1991.

For Appellant: *Captain Michael D. Burt* (argued); *Colonel Richard F. O'Hair* (on brief).

For Appellee: *Captain Ann M. Mittermeyer* (argued); *Lieutenant Colonel Brenda J. Hollis* and *Captain David G. Nix* (on brief); *Major Paul H. Blackwell, Jr.*

*Opinion of the Court*

EVERETT, Senior Judge:

Airman First Class Stephan Sellers was tried at Plattsburgh Air Force Base, New York, by a general court-martial with officer members on charges that in October 1988 he had wrongfully used marihuana and on April 22, 1989, he had raped and forcibly sodomized Monica Jean Lewis, *see* Arts. 112a, 120 and 125, Uniform Code of Military Justice, 10 USC §§ 912a, 920, and 925, respectively.[1] Appellant pleaded not guilty to all the charges and was convicted only of the rape. The sentence adjudged was a dishonorable discharge, confinement for 3 years, total forfeitures, and reduction to E–1. After approval of the sentence by the convening authority and affirmance of the trial results by the Court of Military

---

1. Sellers also was charged under Article 134, Uniform Code of Military Justice, 10 USC § 934, with communicating indecent language to a child under the age of 16 and of false swearing. However, pursuant to a defense motion, trial of these offenses was severed by the military judge.

Review in a short-form opinion,[2] we granted this issue for review:

> WHETHER THE MILITARY JUDGE ERRED BY FAILING TO INSTRUCT THE MEMBERS ON THE AFFIRMATIVE DEFENSE OF MISTAKE OF FACT.

## I

All of the evidence was presented by government witnesses. The first, Sergeant Greenlee, testified that, before 9:00 p.m. on the evening of April 22, Airman Sellers came by his room to seek a ride to the Tingles Nightclub, where appellant worked. Greenlee could not give Sellers a ride because he had no vehicle, but he suggested that appellant seek a ride from Airman Monica Lewis, whose room was in the same dormitory as Greenlee's. Later that evening Greenlee saw Lewis at the NCO club, and "[s]he looked scared or bothered about something."

Airman Alicia Clark, whose dormitory room was near that of Airman Lewis, testified that, between 8:15 and 8:30 p.m. on April 22, she saw Airman Sellers in the hallway of her dormitory; and, at his request, she told him which was Airman Lewis' room.

Airman Michelle Schendzielos, who lived on the same floor as Airman Lewis, saw Sellers come out of Airman Lewis' room at about 9:00 p.m.;

> she was following him. And I looked at him and he zipped up his pants and kept walking.... I looked at him directly—no real expression—a real intense look on his face—not a grin or anything. I didn't look at Airman Lewis directly. I noticed that she was—her face was reddened. Neither one spoke to me.... They just walked past me and Monica was lost in her thoughts as she went past me.

According to this witness, upon seeing Sellers pull up his zipper, she had "said something like, 'isn't that obvious.'" She con-

ceded "that Airman Lewis' face ... could have been red because of that comment."

Mr. Fadi Baradihi, the manager of the Tingles Nightclub, testified that Sellers had worked there and, according to his timecard, came in at 9:21 p.m. on April 22 and left at 12:29 a.m. the next morning. Appellant had been due to arrive at work earlier and had explained to Baradihi: "Sorry I'm late, but I had a reason to be late and the reason was there was a girl in my room and she wouldn't let me go unless we did it." The witness identified a white shirt which appellant had been wearing that evening with a blood stain on the lower right shirt tail. Sellers had "pulled out his shirt" tail that evening, shown Baradihi the blood on the shirt, and "admitted to [having] sex with a female."

Next, the alleged victim, Airman Monica Lewis, who was 19 years old and had been in the Air Force for a year, testified. In November 1988, she had arrived at Plattsburgh and had seen Sellers "occasionally." On December 31, 1988, he had come to her room; and after they had talked for a while, she had accompanied appellant to his room in a nearby dormitory and there, after conversation and kissing, had had sex with him. Sellers had tried by use of "body language" to get her "to perform oral sex," but she had "just said no and that was it." Although they were "still friends after" having sexual intercourse, Airman Lewis had felt that she "didn't want a relationship at that time. It was nothing against him. It was just I didn't want a relationship at that time."

In March 1989, Sellers had come without advance notice to her room—which was different from the room in which she had been living in December. After some conversation, he had kissed her for a few minutes and then consensual sexual intercourse had taken place at about 8:00 or 9:00 p.m. After that occasion, Airman Lewis "wasn't happy with, you know, the way the relationship was. I wasn't—I didn't want him to think that I was just someone to sleep with, that was all. I

2. This opinion erroneously reflects that appellant was tried by judge alone.

didn't—I just said—I made up my mind that I didn't want to see him anymore." Therefore, she had "stayed away from him," although they had talked "[a] couple of times." Once he had asked her for $5.00, which she had not given him, and another time he had asked her to go out with him but she had refused to do so.

On April 22, at about 8:45 p.m., she was alone watching television in her room and was wearing "blue jeans and a sweatshirt and undergarments." She testified that

there was a knock at the door. And I started to get out of the chair to answer it and Airman Sellers came in. And he put his hand behind his back and locked the door and told me to take him to work. And as soon as he said that, I started to get my shoes on. And I was—I was trying to talk to him. I said, where do you work, you know, and all of this stuff, and things like that. I was sitting in the chair, putting on my sneaker. And he came up to me and pulled me up using my wrists and his hands to pull me up. And he started hugging me and kissing me. And I said, "if you think you're going to do this" I said, "you're wrong because I know what you want." And I just kind of—I backed away and I kept putting on my shoes. And he was standing there. And he put his hands to un-button my pants and I held my pants together. And when I was holding my pants together, he would put his hand on my hand and take it away. And back and forth that happened. And then I just told him to stop. I said, "let's leave." I kept saying, "let's leave." And then I started to walk away and he put me on the bed and laid on top of me, and he started—he lifted up my shirt and undid my bra, and put his mouth on my breast.

And I pushed his head away. And I managed to get out from underneath him. And I got up and I was standing up trying to put my shoe on. And I kept saying, "let's go." And he kind of put his hand on my shoulder and pushed me back into the chair. And at that time his pants were undone. And I was bending

down trying to put on my shoe. And his penis was out at that time. And when I was telling him to stop and to leave me alone, and let's go, he put his penis in my mouth. And his hand was on the back of my head. And I tried to push him away and I finally did. And I got up out of the chair. And after that he pulled—I start-ed to go around the chair, between the chair and the bed to go, and he pulled me on top of him. And my legs were against the bed. And again, I was tell-ing him to leave me alone and to stop. And he put his penis in my mouth again. And his hand was on the back of my head. And I pushed up off of the bed and got up and he got up directly behind me and sort of put his arms around—he was standing behind me and he put his arms around my arms and turned me around facing the window. And I was trying to push him away, but he took—he took both of my wrists and he was trying to get my hands together. He put—he finally got my wrists together in one of his hands, and with his other hand, he unzipped my pants and pulled them down to about the middle of my thigh. And then he put his hand on my back and bent me over and he entered very forcefully. And he continued to have his hand on my back. And I was in a lot of pain because it hurt very much. And finally, he let loose of me. And I just sat—I sat into the chair and I was starting to cry a little bit, but I was being really quiet because I didn't know what to do. And he was going into the bathroom and the door was locked at the time. And he couldn't get it opened. And he said, "open the door." And I went and opened it. And then I sat back in the chair. And he came out of the bathroom and he wiped himself with a tissue and threw it into the trash under the sink. And I thought he would leave, but he said—he just stood there and stood there and said, "take me to work." And he wouldn't leave. And so I put my other shoe on and I just walked out the door. He was behind me at this time.

And I just kept walking. I was walking ahead of him. And I walked down the stairs. And he knocked on Airman Greenlee's—Sergeant Greenlee's door and I kept going outside. And I started getting in the car and he said, "No. Let me drive. I know the way. It's quicker and I'm late already and it's your fault." Then after that on the way to where he works he kept asking me what was wrong. And I was ignoring him. And then he slapped me on the leg. And I said, "leave me alone." And after we got to Tingles, he got out of the car. He didn't shut the door. He just got out of the car and that was it.

According to Airman Lewis, she had said, "Wait, no, stop" to Sellers many times; and "I tried to move away from where he was." She could not "scratch him" "because he was holding [her] wrists." When Sellers "placed his penis inside [her] vagina," she had "screamed as loud as I could"; but this was "not very loud" because "I was biting the collar of my sweatshirt in my mouth."

When Lewis and Sellers had left the room and were in the hall, they had seen Airman Schendzielos and Airman Cantrell, but neither she nor Sellers had said anything. She "just kept walking" because she "was scared." She was "terrified ... that he would hurt me."

After Sellers had left the car at Tingles, she "drove back to" her dormitory and was feeling "scared." Upon arrival there, she immediately told Airman Cantrell what had happened; and then she and Cantrell had gone to the NCO Club where Cantrell told Greenlee what had happened. Lewis had then seen a doctor. At that time she was on her menstrual cycle and was "still bleeding." On cross-examination, Lewis conceded that when Sellers had grabbed both of her wrists, she had not screamed or yelled out; and that she had not screamed later when they were struggling on her bed. Sellers had no weapon, and he never threatened to kill her or hurt her if she did not have intercourse.

Special Agent Trahan of the Office of Special Investigations testified that, about 10:30 p.m. on the night of April 22, 1989, a call from the base hospital informed him of a rape complaint. When he arrived there, he saw Airman Lewis, who "was obviously very upset.... She was crying, whimpering. She was having a hard time speaking, pale." After talking to her, he went to the Tingles Nightclub and showed his credentials to Sellers. Before Trahan told appellant of his purpose, Sellers "turned around and faced the wall, and put his hands on the wall in a standard search position." Thereafter, appellant was apprehended and taken to the hospital for examination.

John Brenner, a forensic scientist from the New York State Police Crime Laboratory, testified that certain physical evidence he had examined was "consistent with vaginal intercourse"; but he could not tell whether it was consensual or nonconsensual. His findings were inconsistent with oral sex, and he did not find any of the things—such as flesh or blood under the nails of the alleged victim—which might indicate that a struggle had occurred.

Airman Kathleen Cantrell described her encounter with Sellers and with Airman Lewis in the hallway on the evening of April 22. She had twice called the name of Airman Lewis "because she looked upset, and she didn't answer me." She saw that "her eyes were kind of red and teary and her face was red." However, about 30 to 40 minutes later, Lewis had come to her room, after which they had gone into Lewis' room briefly and finally to the NCO Club, "because she wanted to talk with Sergeant Greenlee." After a few minutes there, they went to the hospital, because "Monica wanted to get medically checked."

Captain Jean Deason, who had been the medical officer of the day, testified that she had examined Airman Lewis and had "noticed she had a red area on the back of her right thigh," which "appeared to be a recent bruise." She had "found mobile sperm" in Lewis—which indicated "recent [sexual] intercourse." Dr. Garenani made

similar findings as to Airman Lewis. Also, in a visual external examination of Sellers he had found "fresh or recent" "abrasions or cuts on his left hand." From his examination of Airman Lewis, he also concluded that she had received injuries to her right breast within the preceding 6–12 hours.

On cross-examination, the doctor conceded from his findings it was "impossible for [him] to tell ... whether [it] was consensual or nonconsensual intercourse." Moreover, he had not found "a laceration" or "tearing of the vaginal area," as he might have expected if "forcible intercourse" had occurred.

After counsel had argued vigorously and extensively their respective positions, the military judge gave detailed instructions to the court members. Neither counsel voiced "any objections to the instructions given" or asked for "additional instructions." The question now before us is whether, nonetheless, the military judge erred by not instructing the court members that Sellers should be acquitted if the Government failed to prove beyond a reasonable doubt that Sellers had not made an honest and reasonable mistake as to the victim's consent. *See United States v. Peel*, 29 MJ 235 (CMA 1989), *cert. denied*, 493 U.S. 1025, 110 S.Ct. 731, 107 L.Ed.2d 750 (1990); *United States v. Gamble*, 27 MJ 298 (CMA 1988). *Cf. United States v. Langley*, 33 MJ 278 (CMA 1991).

## II

During individual *voir dire* of some of the court members, defense counsel had asked whether "you think one person's lack of consent could be seen as another person's way of teasing." This question seems to suggest that during the trial the defense might claim that Sellers had made a mistake of fact. However, at no other point in the trial is there any intimation that the defense was relying on mistake. Instead, the defense vigorously contended that Airman Lewis had in fact consented to the intercourse in her room. Indeed, the defense implied that Airman Lewis was embarrassed because others became aware that she had engaged in intercourse with Sellers and, therefore, she had claimed that he had raped her.[3]

We have made clear that, when evidence adduced at trial reasonably raises a defense, the military judge must *sua sponte* deliver appropriate instructions to the court members with respect thereto. *United States v. Peel* and *United States v. Gamble*, both *supra; see also* RCM 920(e)(3), Manual for Courts–Martial, United States, 1984. Moreover, it is unnecessary that the evidence tending to establish a defense be compelling beyond a reasonable doubt; and the accused's right to an instruction on a defense is not waived by the absence of a request. *United States v. Taylor*, 26 MJ 127, 129 (CMA 1988).

In this case, the accused did not take the stand to tell his version of the events or to describe his state of mind. However, we do not consider this to be indispensable. For example, a pretrial statement by the accused which is offered in evidence by the prosecution might raise the issue of mistake—*United States v. Turner*, 27 MJ 217 (CMA 1988); or there could be evidence about some comment which an accused had made which was admissible to show his state of mind and which indicated that he believed that he had received the consent of the alleged victim. *Cf.* Mil.R.Evid. 803(3), Manual, *supra.*

[4] The present case is borderline. Many of the circumstances—such as the two previous incidents of sexual intercourse—not only tend to show that Airman Lewis might have given her consent but also that, even if she did not, Sellers might reasonably have believed that she was consenting. The same might be said with respect to her failure to scream loudly or yell for help, or to try to flee or remove herself from the scene. Certainly, Sellers did not

---

**3.** In some of the questions on *voir dire,* the defense mentioned the interracial aspects of the sexual intercourse; and there may have been some intimation that this factor contributed to Airman Lewis' embarrassment and led her to accuse Sellers of rape.

demonstrate a consciousness of guilt when he arrived at the Tingles Nightclub that evening.

As the record stands, however, it would have been virtual speculation for the court members to find that Airman Lewis did not consent but that Sellers believed she had.

The situation is very akin to that in *Taylor*, where we concluded that

> [a]lthough the defense theory at trial is not dispositive in determining what affirmative defenses have been reasonably raised by the evidence the utter absence of any hint of a mistake defense in any of the defense counsel's many sidebar discussions with the military judge or in his lengthy argument to the members on findings confirms our own evaluation of the evidence.

26 MJ at 131 (citation omitted).

Sellers was ably defended by his counsel at trial. Since this case was tried subsequent to several of our opinions which have upheld the defense of mistake-of-fact in a rape trial, *see United States v. Baran*, 22 MJ 265 (CMA 1986); *United States v. Carr*, 18 MJ 297 (CMA 1984), we perceive "no basis to assume that defense counsel simply overlooked the availability of this defense." *See* 26 MJ at 131 (footnote omitted). Instead, we conclude that defense counsel and the other parties "recognized that mistake of fact was not reasonably raised by the evidence presented at trial." 26 MJ at 131.

### III

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judge COX concur.