# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
YOB, MORAN, and BURTON
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Staff Sergeant CHRISTOPHER L. BAXTER**
**United States Army, Appellant**

ARMY 20100487

Headquarters, Fort Bliss
Michael J. Hargis, Military Judge
Colonel Michael J. Benjamin, Staff Judge Advocate

For Appellant: Mr. Frank J. Spinner, Esquire (argued); Lieutenant Colonel Peter Kageleiry, Jr., JA; Mr. Frank J. Spinner, Esquire (on brief).

For Appellee: Captain Jessica J. Morales, JA (argued); Lieutenant Colonel Amber J. Roach, JA; Major Catherine L. Brantley, JA; Captain Jessica J. Morales, JA (on brief).

20 February 2013

-----------------------------------
OPINION OF THE COURT
-----------------------------------

MORAN, Judge:

A panel of officer and enlisted members, sitting as a general court-martial, convicted appellant, contrary to his pleas, of two specifications of maltreatment and one specification of forcible sodomy, in violation of Articles 93 and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 893, 925 (2006) [hereinafter UCMJ]. The panel sentenced appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant's case is before this court for review under Article 66, UCMJ. Appellant raised three assignments of error, one of which merits discussion. Appellant alleges the military judge erred "by failing to instruct the members that mistake of fact is a defense to sodomy by force." After considering the record of

trial, the parties' pleadings, and the matters discussed during oral argument, we disagree with appellant.

## BACKGROUND

After graduating from Advanced Individual Training in September 2007, Specialist (SPC) SK's first duty station was Korea.[1] Appellant served as SPC SK's first-line supervisor at the 121st Combat Support Hospital dining facility (DFAC) in Yongsan Garrison, South Korea. Specialist SK saw appellant on a daily basis.

In early December 2007, appellant called SPC SK into his office because "he just wanted to talk to [SPC SK] about [her] personal life and how things were going." During this discussion, appellant asked SPC SK if she "had ever been with a black guy." Appellant also asked SPC SK if she "would ever fuck him." SPC SK was shocked by this conversation. She testified that she told appellant she had a boyfriend and did not want to ruin their relationship. However, SPC SK did not immediately report this conversation to anybody because she "was scared that people would think that [she] was lying about it because he was [a non-commissioned officer (NCO)] and [she] thought that if [she] were to say something, that they would take his side over [hers] because [she] was new in the military." Specialist SK also thought that appellant would leave her alone after she rebuffed his advances.

### *SPC SK's Version of the Sodomy*

Specialist SK testified a subsequent incident occurred in December 2007. Specialist SK and a fellow junior enlisted soldier were working at the DFAC. Around lunchtime, SPC SK's co-worker was working in the front of the DFAC serving customers. Specialist SK was in the back cleaning and preparing food. At some point, appellant informed SPC SK that he needed her help in the supply room to get items for food preparation. Specialist SK complied and walked into the supply room ahead of appellant. Appellant let the door shut behind them.

Specialist SK described the door to the supply room as being a big windowless metal door "about five inches thick." The walls in the supply room "were about four or five inches thick." In addition, SPC SK testified that two loud fans constantly ran in the DFAC, which would make it difficult for a soldier in the serving area to hear what was going on in the back of the DFAC. Specialist SK estimated the path in the supply room was "about two to two and a half feet wide" because there were shelves with food on both sides of it. The supply room door automatically locked after entry, and one could only access the supply room with a

---

[1] Specialist SK was a Private (E-2) at the time.

key.  Only certain soldiers possessed a key to access the supply room, such as the staff duty NCO, the supply NCO, and the DFAC NCOIC.

After asking appellant what help he required, appellant responded "[y]ou know you want to suck my dick."  Specialist SK was shocked and became scared at that point, and she told appellant that she would report him.  Appellant responded by saying "I don't think you will."  At that point, appellant pulled down his pants to about mid-thigh level.  Appellant then grabbed SPC SK's shoulders and pushed her down towards his erect penis.  Specialist SK tried to resist, but appellant put his hand on the back of SPC SK's head and continued to pull her head towards him.  Specialist SK fell to the ground, and she gave up resisting appellant because he was stronger than she.  Again, appellant began pulling SPC SK's head towards him.  Specialist SK then recounted the following:

> I looked up to him to tell him, "No, I don't want to," and when I had opened my mouth is when he had put his penis inside of my mouth then proceeded to move my head back and forth.

Nonetheless, SPC SK attempted to stop and resist again, but appellant stated "[y]ou know you like it."  Appellant next told SPC SK to "[g]o deeper."  After a couple of minutes, appellant let go of the back of SPC SK's head and instructed her "to stand up, turn around, get against the wall, and pull [her] pants down."  Specialist SK did so because she "didn't want to get hurt."  Appellant started approaching SPC SK.  However, at that exact time, SPC SK's co-worker entered the back area and yelled for help out in the front serving area.  Hearing this, SPC SK pulled her pants up and turned around.  Appellant stepped aside, let SPC SK out of the supply room, and instructed her to help her co-worker.  Appellant also stated that they would "finish this later."

### *Appellant's Version of the Sodomy*

Appellant spoke with agents from the U.S. Army Criminal Investigative Command (CID) twice in response to SPC SK's eventual complaint.  After initially denying any sort of sexual contact with SPC SK, appellant presented a completely different account of what occurred in the supply room during a videotaped statement introduced as Prosecution Exhibit (PE) 2.

In the videotaped statement, appellant admitted that oral sex occurred, but only because SPC SK initiated it.  According to appellant, SPC SK approached him in the supply room, grabbed his groin, and stated that she wanted to see his penis.  Appellant complied and exposed his penis to SPC SK.  Specialist SK then got down on her knees by her own volition and started performing oral sex on appellant.  Appellant stated his hands were at his sides during the entire sexual encounter.

3

After performing oral sex on appellant for a couple of minutes, appellant told CID that SPC SK stated she wanted to have sexual intercourse. She then proceeded to lower her pants; however, nothing else occurred between the two because SPC SK was menstruating.

In the videotaped statement, appellant also stated that he did not enjoy the oral sex SPC SK provided. Moreover, appellant adamantly denied using any force and denied directing SPC SK to perform oral sex on him. Appellant specifically ended the interrogation by stating that he did not put his hand on SPC SK's head while she performed oral sex on him.

The next day appellant provided a written statement to CID. This statement was introduced into evidence as PE 4.[2] Prosecution Exhibit 4 provided, in pertinent part, the following:

> Q: Who initiated oral sex between you and SPC [SK]?
>
> A: She did.
>
> . . .
>
> Q: Did [SPC SK] give you any indication that she did not want to continue giving you oral sex?
>
> A: At one point she stopped and told me that she was tired.
>
> Q: What happened next?
>
> A: I put my hand on her head and told her to go deeper.
>
> . . .
>
> Q: What did you take it to mean when she told you that she was tired?
>
> A: That she needed a break.
>
> Q: Did you force her to continue to perform oral sex on you when you guided her head to your penis?

---

[2] Before this court, appellant now asserts that PE 4 raises the issue of mistake of fact as to consent. However, appellant did not raise this argument at trial.

A:  Yes, I may have forced her to continue by guiding her head back to my penis, but not to the extent that she is saying.  I didn't hold her head with my hand.  I didn't tell her or threaten her to continue.  Looking at it now I see that maybe we couldn't [sic] have continued.  Or maybe she should have been more clear to me, like saying stop or I don't want to continue.

Q:  How long did she perform oral sex on you after you guided her head to your penis?

A:  About a minute.

Q:  Why did she stop after a minute of giving you oral sex?

A:  I asked her to because it was not pleasurable to me.

Q:  After she stopped, what happened next?

A:  She turned around and pulled off her pants and panties down and said something to the effect of lets have sex.

Q:  Did you hold SPC [SK] down by her shoulders when she was performing oral sex on you?

A:  No.

Q:  Did you physically do anything to her to force her to continue to perform oral sex on you?

A:  No.

*Trial Proceedings*

At trial and before this court, appellant asserted that he involuntarily provided the statement introduced as PE 4.  The military judge denied appellant's motion to suppress PE 4 as being involuntarily made.  Nonetheless, appellant's civilian defense counsel did argue the unreliability of PE 4 during his closing argument:

Members, I would like to briefly talk to you about statements that the government has admitted into evidence and there is two sets of statements. . . .  Now, members, we know what happened in [PE 2] because it was

5

recorded. . . . Now the government admits another statement [PE 4] from six hours. . . . We don't know what happened during those six hours. It wasn't recorded. If you go back and look at the statement, [appellant] indicates that, yes, he was promised something or forced to make a statement right there in this statement the government introduced. . . . He wrote in, "Yes. I was promised or forced to make this statement." And even after six hours, six hours where we don't know what happened because it wasn't recorded, there is not a, "Yes, I did it." But ask the government yes is (sic), "After we consensually started it, she indicated she was tired and I may have forced her." Not, "I did." "I might have." After six hours, "I might have forced her to continue. . . ." Members, as you go back through, it's the first statement that carries the weight. It's the first statement that you know what happened. It's the first statement you can actually see and see in his own words. It's not the statement that he must come back and resign the next day because CID made a mistake.

Appellant's theory and trial strategy were evident from the outset of the case. During opening statements, appellant's civilian defense counsel characterized SPC SK's allegations as inconsistent, illogical, false, and unsupported by the evidence. Appellant's civilian defense counsel pointed out that SPC SK did not yell or cry for help during the encounter despite the fact that another soldier was present, nor did she strike appellant in the groin or otherwise try to resist him.

In addition, at two separate Article 39(a), UCMJ, sessions during appellant's court-martial, appellant's civilian defense counsel informed the military judge that consent was going to be the defense in this case.

Likewise, at an Article 39(a), UCMJ, session, the focus of which was findings instructions, appellant's civilian defense counsel affirmatively declined an instruction on the lesser-included offense of consensual sodomy, and did not request a mistake of fact instruction for the forcible sodomy offense. *See* Dep't of Army Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 3-51-2, note 20, & para. 5-11-2 (1 Jan. 2010).[3] After the military judge reviewed with the parties the instructions he planned to give the panel, appellant's civilian defense counsel did not

---

[3] The military judge determined, in consideration of *Lawrence v. Texas*, 539 U.S. 558 (2003), that consensual sodomy was a lesser-included offense in this case, and did, therefore, provide the lesser-included offense instruction. *Cf. United States v. Marcum*, 60 M.J. 198 (C.A.A.F. 2004).

object to the lack of instruction concerning mistake of fact as to consent. In his subsequent instructions to the panel, the military judge did not give a mistake of fact instruction sua sponte.

During his closing argument, appellant's civilian defense counsel again stressed that SPC SK's allegations were inconsistent, illogical, false, and unsupported by the evidence. Again, appellant's civilian defense counsel pointed out that SPC SK did not scream, bite appellant's penis, or otherwise strike him in the groin. Defense counsel argued the government did not produce any corroborating evidence. Defense counsel then identified SPC SK's motive to fabricate, i.e., she did not want her boyfriend to find out that she had consensually performed oral sex on appellant. In addition, defense counsel discussed the fact that SPC SK did not report this attack until after a year and a half had passed. In contradistinction, defense counsel emphasized appellant's extensive "good soldier" defense and the evidence of SPC SK's character for untruthfulness. Finally, defense counsel highlighted the fact that appellant had continually asserted the purely consensual nature of the encounter in PE 2. At no time did appellant's defense counsel assert or even imply that appellant mistakenly believed SPC SK had consented to the oral sex that occurred between the two of them.

**LAW**

Whether the military judge instructed the panel properly is a question of law that we review de novo. *United States v. Maynulet*, 68 M.J. 374, 376 (C.A.A.F. 2010). While a military judge has "substantial discretionary power" in deciding to issue a panel instruction, he or she must instruct on an affirmative defense, sua sponte, if the evidence reasonably raised it. *Id*. "The test whether an affirmative defense is reasonably raised is whether the record contains some evidence to which the court members may attach credit if they so desire." *Id*. (quoting *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000)). Some evidence can be "raised by evidence presented by the defense, the prosecution, or the court-martial." *United States v. Hibbard*, 58 M.J. 71, 73 (C.A.A.F. 2003) (quoting Rule for Courts-Martial [hereinafter R.C.M.] 916(b) discussion). Moreover, "the accused's right to an instruction on a defense is not waived by the absence of a request." *United States v. Sellers*, 33 M.J. 364, 368 (C.M.A. 1991) (citing *United States v. Taylor*, 26 M.J. 127, 129 (C.M.A. 1988)). "However, even if an affirmative defense is reasonably raised by the evidence, it can be affirmatively waived by the defense." *United States v. Gutierrez*, 64 M.J. 374, 376 (C.A.A.F. 2007) (citations omitted).

"The defense theory at trial and the nature of the evidence presented by the defense are factors that may be considered in determining whether the accused is entitled to a mistake of fact instruction, but neither is dispositive." *Hibbard*, 58 M.J. at 73 (citations omitted). In determining whether a mistake of fact as to consent instruction is warranted, this court should assess "the manner in which the

issue was litigated as well as the material introduced into evidence at trial." *Id*. at 76 (citation omitted). "Although it is not necessary to present evidence of a mistake of fact in the defense case on the merits or to discuss such evidence in closing argument in order to obtain an instruction in a proper case, . . . , it is appropriate for an appellate court to take into account the absence of such a presentation in assessing the significance of the evidence." *Id*.

"When an accused is charged with a crime in which knowledge or intent is material as to an element, 'it is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would be not guilty of the offense.'" *Hibbard*, 58 M.J. at 72 (quoting R.C.M. 916(j)). If the accused is facing a general intent crime such as forcible sodomy, "the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id*. (quoting R.C.M. 916(j)). Stated differently, appellant's mistaken belief as to consent must be both subjectively honest and objectively reasonable under the circumstances. *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998).

If it is determined that the military judge should have given a mistake of fact instruction, "the test for determining whether this constitutional error was harmless is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. DiPaola*, 67 M.J. 98, 102 (C.A.A.F. 2008) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). In other words, "[i]s it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Id*. (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

## DISCUSSION

The facts of appellant's case present a clear, unambiguous dichotomy between actual consent and mistake of fact as to consent. Appellant's case is not the "mixed message" fact pattern present in *DiPaola*. *See DiPaola*, 67 M.J. at 102 (finding error because "the record reveals a 'mixed message' evidentiary situation which, when considered in conjunction with defense counsel's 'mixed message' theme in his opening and closing statements and his request of a mistake-of-fact instruction, comprises 'some evidence' of a mistake of fact that the panel could attach credit to if it so desired."). Instead, appellant's case focused on SPC SK's lack of credibility and the assertion that she initiated a consensual sexual encounter.

The dichotomy present in appellant's case between consent and mistake of fact is illustrated in the analysis offered by our superior court in *United States v. Buckley*:

> [T]he defense of mistake of fact was not raised by the evidence. There were only two possible versions of what happened to Victim A, in the barracks room, both were presented to the members. The Victim A testified that appellant raped her as she slept. Appellant maintained that he engaged in consensual sexual intercourse with Victim A on three separate occasions. If the members believed appellant's version, the victim consented three times. There was no middle ground and no evidence that appellant received a "mixed message" of consent or non-consent.

*United States v. Buckley*, 35 M.J. 262, 264 (C.M.A. 1992) (citation and internal punctuation marks omitted). Given the record "and in view of the absence of any defense contention at trial that there was a reasonable mistake of fact and the absence of any request for instructions thereon, we are convinced that this defense was not raised at trial." *Id.* (quoting *United States v. Peel*, 29 M.J. 235, 242 (C.M.A. 1989)).

Similar to *Buckley*, there was no middle ground present in appellant's case. Since only actual consent was at issue in appellant's trial, "a mistake-of-fact instruction is not warranted where the evidence raises and the parties dispute only the question of actual consent." *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995). While appellant's defense counsel did bring up SPC SK's lack of credibility, her character for untruthfulness, her motive to fabricate, and the fact that appellant was a good soldier, this evidence did not change the fact that appellant's case was essentially a "he said / she said" case. If the panel believed SPC SK, appellant committed forcible sodomy. If the panel believed appellant, the sodomy was consensual. Based upon the evidence presented and the manner in which it was used, there was no middle ground for mistake of fact to enter.

In this regard, the facts of appellant's case can be contrasted with the "borderline" facts in *Sellers*, 33 M.J. 364. At trial, Sellers "vigorously contended that Airman [ML] had in fact consented to the intercourse in her room." *Id.* at 368. At no point in the trial did the defense indicate they were relying on mistake of fact. *Id.* In fact, "the defense implied that Airman [ML] was embarrassed because others became aware that she had engaged in intercourse with Sellers and, therefore, she had claimed that he had raped her." *Id.* On appeal, Sellers claimed that the military judge should have given an instruction as to mistake of fact. *Id.* The court provided the following discussion:

> The present case is borderline. Many of the circumstances—such as the two previous incidents of sexual intercourse—not only tend to show that Airman

> [ML] might have given her consent but also that, even if
> she did not, Sellers might reasonably have believed that
> she was consenting. The same might be said with respect
> to her failure to scream loudly or yell for help, or to try to
> flee or remove herself from the scene. . . .
>
> As the record stands, however, it would have been virtual
> speculation for the court members to find that Airman
> [ML] did not consent but that Sellers believed she had.

*Id.* at 368–69. The court concluded, therefore, "that defense counsel and the other parties 'recognized that mistake of fact was not reasonably raised by the evidence presented at trial.'" *Id.* (quoting *Taylor*, 26 M.J. at 131)). This case is not borderline, as appellant and SPC SK lacked any kind of previous sexual history from which appellant could maintain a subjectively honest belief as to consent.

We do not find the record contains some evidence as to a mistake of fact defense in appellant's case. Appellant's defense counsel concentrated throughout the trial on the fact that SPC SK could not be believed, that she initiated the sexual contact, and that she consensually performed oral sex on appellant. Defense counsel made no attempt to explore and develop grounds for a mistake of fact defense during the trial. Further, defense counsel eschewed an instruction on consensual sodomy and never sought a mistake of fact instruction from the military judge. While this does not constitute an express waiver of such an instruction, it is illustrative of how the parties viewed the issue at trial. *See DiPaola*, 67 M.J. at 102 (observing that counsel's request for an instruction is indicative of the defense's theory of the case and can be considered in determining whether "some evidence" has been raised to support an instruction). Finally, defense counsel never explicitly or implicitly argued that appellant mistakenly believed SPC SK's acts to be consensual. *See Hibbard*, 58 M.J. at 76 (recognizing that while the defense presentation at trial is not definitive in determining whether a defense has been reasonably raised by the evidence, the court "may take into account the absence of a mistake of fact approach from the defense case when considering [the] evidence").

Appellant's isolated comment in PE 4 that "maybe we [sh]ouldn't have continued[] [o]r maybe she should have been more clear to me, like saying stop or I don't want to continue" does not compel otherwise. First, appellant's defense counsel argued to the panel that PE 4 should be discounted in its entirety because it was unreliable and was the product of heavy-handed CID tactics. Beyond that argument, however, PE 4 must be considered in its entirety. Appellant's narrative describes a course of conduct in which SPC SK initiates all sexual contact. This includes, according to appellant, that SPC SK wanted to engage in sexual intercourse *after* she had stopped fellating him. No fair reading of PE 4 has appellant describing non-consensual activities between himself and SPC SK. In addition, appellant's

defense counsel never connected this comment to any specific evidence of appellant's understanding or intent at trial. *Hibbard*, 58 M.J. at 76. Instead, appellant's defense counsel distanced appellant from this comment by arguing that the panel should disregard PE 4[4] and focus instead on appellant's statement to CID in PE 2.

In sum, we hold that the military judge did not err in failing to give a mistake of fact instruction sua sponte. A mistake of fact instruction is unwarranted when the only issue focused on at trial is actual consent. *See Willis*, 41 M.J. at 438; *see also United States v. Mahone*, 14 M.J. 521, 524 (A.F.C.M.R. 1982) (finding a mistake of fact instruction unwarranted because the only contested issue centered on consent, as "[t]he gist of the prosecution's case was that the victim was dragged into a room in the barracks, thrown on a bed and held there while the three accused had sexual intercourse with her . . . [while] the defense maintained that the victim initiated the sexual encounter by coming to the room and removing her slacks and panties[,] . . . cooperated freely in the sex act and appeared to enjoy it."); *United States v. Perry*, 12 M.J. 920, 922 (N.M.C.M.R. 1982) (finding appellant's testimony "that the victim was the sexual aggressor, inviting him to her room, removing her skirt, and pulling him unto her bed where she commenced kissing him and fondling his penis" only raised the factual issue of consent and not mistake of fact as to consent).

Even assuming that the military judge should have provided a mistake of fact instruction to the panel, it is clear beyond a reasonable doubt that a rational jury would have convicted appellant despite this alleged error. *Neder*, 527 U.S. at 18. The lack of a mistake of fact instruction did not undercut a defense theory because appellant's defense counsel, on two occasions, expressly informed the military judge that consent was their defense in this case. *Cf. DiPaola*, 67 M.J. at 103 (stating that the missing mistake of fact instruction "essentially undercut a defense theory and could very well have contributed to the finding of guilty.") (quoting *United States v. Lewis*, 65 M.J. 85, 89 (C.A.A.F. 2007)) (internal quotation and punctuation marks omitted). Again, appellant and SPC SK recounted two diametrically opposed accounts of what happened in the supply room of the DFAC. Having heard the evidence and having conducted a credibility assessment, the panel convicted appellant. A mistake of fact instruction would not have changed appellant's defense or defense theory in this case, as the panel still had to decide who to believe in this "he said / she said" contest.

---

[4] Appellant does not claim that he received ineffective assistance of counsel based upon his defense counsel's treatment or classification of PE 4 at trial.

11

BAXTER—ARMY 20100487

## CONCLUSION

On consideration of the entire record, the assigned errors, and the matters discussed during oral argument, we find appellant's arguments to be without merit. We hold the findings of guilty and the sentence as approved by the convening authority correct in law and fact. Accordingly, the findings of guilty and the sentence are AFFIRMED.

Senior Judge YOB and Judge BURTON concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court