# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
LIND, KRAUSS, and PENLAND
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist DANIEL D. RUDE**
**United States Army, Appellant**

ARMY 20120139

Headquarters, Fort Bliss
Karen W. Riddle, Military Judge
Colonel Francis P. King, Staff Judge Advocate

For Appellant: William E. Cassara, Esquire (argued); Captain Brian D. Andes, JA;
William E. Cassara, Esquire (on brief and on reply brief).

For Appellee: Captain Benjamin W. Hogan, JA (argued); Colonel John P. Carrell,
JA; Lieutenant Colonel James L. Varley, JA; Major Steven J. Collins, JA; Captain
Benjamin W. Hogan, JA (on brief).

26 February 2015

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

KRAUSS, Judge:

An officer panel, sitting as a general court-martial, convicted appellant
contrary to his pleas, of rape by force and wrongful sexual contact in violation of
Article 120, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 920
(2006 & Supp. III 2010).[1] The panel sentenced appellant to a dishonorable
discharge, ten years confinement, forfeiture of all pay and allowances, and reduction

---

[1] Appellant was acquitted of conspiring with a Mr. JP to commit rape. Alternatively
charged lesser-included offenses of aggravated sexual assault by causing bodily
harm and assault consummated by a battery were subsequently dismissed.

to the grade of E-1.  The convening authority approved only a finding of guilty of aggravated sexual assault by causing bodily harm and only so much of the sentence as provided for a bad-conduct discharge and confinement for four years.  Appellant was credited with one day against the sentence to confinement.

This case is before the court for review under Article 66, UCMJ.  Appellant assigns five errors complaining that: (1) the military judge erred by failing to apply safeguards to the consideration of propensity evidence by giving an erroneous spillover instruction and by failing to give an instruction on the proper use of propensity evidence; (2) the judge erred by denying a defense motion to compel an expert consultant; (3) the judge erred by permitting a sexual assault nurse examination expert to offer "credibility quantification" evidence; (4) the judge erred by admitting certain hearsay statements; and (5) the evidence is factually insufficient to support a finding of guilty of aggravated sexual assault by causing bodily harm.

## FACTS & PROCEDURAL BACKGROUND

Appellant was convicted of sexually assaulting two different women on the same night and in the same house during the course of a college party at his friend JP's house.  Each woman has the same initials, SB.  The court-martial convicted appellant of raping SB1 by force and committing an act of wrongful sexual contact upon SB2.  The convening authority disapproved the finding of rape, approving a lesser-included offense of aggravated sexual assault by bodily harm, and disapproved the finding of wrongful sexual contact.  Though the convening authority disapproved the latter finding of guilty, the facts associated with that offense are relevant to our review of the outstanding conviction.

The wrongful sexual contact of SB2 occurred before the rape of SB1.  Anywhere from 20-50 college-age men and women attended the party at JP's house.  There was much drinking and convivial behavior.  During the party, SB2 and another man repaired to a bedroom where they lay down together on a bed under the covers.  Appellant and JP entered that room and engaged the two in small talk.  Appellant lay down next to SB2, and, without any invitation or expectation on the part of SB2, stuck his hand down her pants and touched her vagina.  SB2 demurred.  Appellant removed his hand and ceased any further efforts with SB2.  Appellant and JP thereafter left the room.

SB1 went to the party with a few friends.  She was acquainted with JP but did not know the appellant.  SB1 drank throughout the party and became drunk.  She grew weary and, at some point, very early in the morning, found a place to sleep on the floor of a bedroom.  Sometime later, SB1 was roused from her sleep by a man, and, in what she essentially described as a haze, was led to another room by her wrists where, without her consent, this man removed her clothes and commenced a

2

sexual assault against her. She testified that she said no, but, because she was enfeebled by drink and sleep or for reasons she could not explain, was unable to effectively resist the assault. Another man entered the room not long after the initial assault began. Though the room was dark, there was sufficient light for SB1 to recognize JP as her initial assailant.

The second man then joined JP in a continuing sexual assault upon SB1. SB1 resisted more forcibly. She repeatedly said no and physically resisted to the extent she was capable. SB1 further testified that both men took turns raping her and holding her arms above her head. She testified that though she persistently struggled to free herself from their grasp, she just did not have the strength to overcome the physical strength used by the two men to hold her down and rape her. Ultimately, after each repeatedly took turns raping SB1 while the other pinned her arms down above her head, and as one of the men attempted to shove his penis in her mouth as the other performed sexual intercourse, she succeeded in freeing one of her arms, elbowed the man attempting sodomy, knocked him over and effectively interrupted the continuing assault that also then effectively brought the assault to a close. Recoiling from the men, she wrapped herself in a blanket on the bed. JP apologized and the two men left the room. SB1 then fell asleep for a short while.

After the event, JP and appellant celebrated their sexual encounter with SB1 with a fist bump.

When she awoke she immediately found one of her friends who had also spent the night, declared that she had been raped, and demanded that they leave immediately. Her friend described SB1 as terribly distraught. Another friend came to pick up both of the women and drove them back to her house along with a third friend. SB1 then reported the rape to her parents.

Testimony also established that that morning JP and appellant discussed their sexual encounter with SB1 with others present in the house.

SB1 agreed to undergo a sexual assault examination, but she elected not to pursue a formal complaint with the police. About a month later, she changed her mind and she accused JP and a second man, who she could not identify, of raping her as described above.

The sexual assault examination revealed minor injuries to her vagina and a bruise on her thigh. DNA swabs were taken from her vagina. DNA swabs were taken from JP and the appellant. Government DNA testing revealed the presence of appellant's DNA in SB1's vagina but found no trace of JP's DNA.

The government planned to perfect its proof that appellant was the second assailant by calling DNA experts to establish that he committed the sexual act

alleged.  The defense, therefore, requested its own DNA expert to assist defense counsel's ability to interpret the government's evidence and choose between presentation of a consent defense and presentation of a defense based on attacking the reliability of the DNA testing.  After hearing argument from both parties on the matter, the judge stated:  "The court will take the matter under advisement and issue a ruling in due course, again prior to--prior to the start of trial."

Eleven days after the hearing on his request for DNA expert assistance, appellant stipulated, as a matter of fact, that the DNA samples obtained from him "were properly collected, transported, and safeguarded in full compliance with all applicable standard operating procedures before and during any testing at the Office of the Attorney General Crime Laboratory Division, Bismarck, North Dakota[,]" and that, "[i]t was undisputed . . . that these items arrived at and were tested at [the same laboratory] while in the same condition as when they were seized . . . ."

Approximately three weeks later, on the first day of trial, defense counsel made the following remarks in his opening statement:

> Specialist Daniel Rude had sex with [SB1] that night. We're not going to deny it.  We're not going to hide from it.  We're going to embrace it.  They're going to call people in here to show you that DNA matches up.  I'm telling you right now:  The sex was consensual.  We're not going to object to the DNA analysis.  We're not going to try to show that it could've been somebody else's DNA. There was consensual sex that night.  Write it down.  We will not object.

In the government's opening statement, trial counsel referred to appellant as "a predator . . . lurking on campus" and that he and JP were in search of prey during the course of the party.

As the government's case in chief proceeded, and in addition to the evidence elicited and described above, the judge accepted, over defense objection, the nurse who examined SB1 as an expert on the subject of sexual assault nurse examination. The nurse testified that the injuries she observed on SB1's body were consistent with SB1's complaint of sexual assault.  Later, the military judge, without objection, conveyed a question from a panel member as follows:  "[I]s . . . the vaginal and cervical bruising that you noted-- is that consistent with rape?"  The witness replied, again without any objection:  "It could be consistent with rape.  There has been a study within the last 10 years that would indicate that that type of bruising is five to eight times more likely to occur with nonconsensual sex than consensual sex."

The day after the examination, SB1 discovered additional bruises on her chest and left elbow that she attributed to the sexual assault. Over a defense hearsay objection, the judge permitted the examining nurse to relate that SB1's mother contacted her after the exam and "indicated that [SB1] had had some additional bruising present and was more sore and asked if she should come back in." The nurse had advised SB1 that further bruising associated with the reported assault might appear later. In light of this, additional photographs were taken documenting these bruises.

Each of SB1's friends, described above, testified that they had known SB1 since early childhood, more than 10 years, that they were all close friends and had remained close over all of those years. Each testified that they had never seen SB1 so upset, distraught, and scared. SB1 repeated to each that she had been raped. Each also testified that in her respective opinion SB1 was truthful and that she enjoyed a reputation for truthfulness in the community.

The government also produced the DNA evidence and through the testimony of its expert established that appellant's DNA was found in SB1's vagina while JP's DNA was not. In cross-examination, the defense established that if a man were wearing a condom during sexual intercourse, he may leave no trace of his DNA inside a woman's body.

Appellant called JP as a witness to testify in his defense case on findings. JP testified in no uncertain terms that he and appellant engaged in consensual sexual intercourse with SB1 the night alleged. Defense counsel also elicited from JP that he wore a condom during the sexual encounter.

Prior to closing arguments, and during a hearing outside of the presence of the members on the subject of instructions, government counsel objected to the judge's proposed spillover instruction. Trial counsel essentially argued that the instruction was not appropriate because the evidence of assault against two different women was relevant propensity evidence under Military Rule of Evidence 413: "it shows a propensity of--the man is committing sexual assault against one person, then that shows a propensity that he's more likely to do it against the other person."

Both parties then seemed to agree that a spillover instruction was only appropriate in relation to the alternatively charged lesser-included offense of an assault consummated by a battery against SB2. When the judge said she would then tailor the instruction to that charge alone, the defense objected, stating:

> [I]t could mislead the panel into thinking that they must apply it . . . to the other charges and specifications. Even with 413 and instructions, they "may" apply it to determine propensity. If you say it's good for one but not

> good for the other, the defense feels that it might send a message that they have to apply it. We would just like that objection noted for the record.

The judge then said: "Okay, and I can add that in my language."

The judge never offered any Military Rules of Evidence 404 or 413 analyses. Trial counsel never referred to the evidence as propensity evidence before the panel.

The judge ultimately instructed the panel that generally, an accused may be convicted based only on evidence before the court and not on evidence of a general criminal disposition.

> [N]ormally each offense must stand on its own, and you must keep the evidence of each offense separate. Stated differently, if you find or believe that the accused is guilty of one offense, you may not use that finding or belief as a basis for inferring, assuming or proving that he committed any other offense. Similarly, if evidence has been presented which is relevant to more than one offense, you may, however, consider that evidence with respect to each offense for which it is relevant. For example, if a person were charged with stealing a knife and later using that knife to commit another offense, evidence concerning the knife, such as that the person being in possession of it or that the person's fingerprints were found on it, could be considered with regard to both offenses. But the fact that a person's guilt of stealing the knife may have been proven is not evidence that that person is also guilty of any other offense.
>
> Now, the burden is on the prosecution to prove each and every element of each offense beyond a reasonable doubt. Proof of one offense carries with it no inference that the accused is guilty of any other offense.
>
> *Now, with regards to this specific instruction, I advise you that it applies to--specifically to Charge III and its Specification,*[2] *and it may--it may and can apply to the*

---

[2] The Specification of Charge III alleged the lesser-included offense of assault consummated by a battery upon SB2, which was ultimately dismissed after findings.

> *other ones, but you do not have to apply those to those*
> *other charges.*

(emphasis added).

The judge then concluded with a standard instruction on the presumption of innocence and the government's burden to prove appellant's guilt beyond a reasonable doubt.

When prompted, defense counsel made no objection to the instructions rendered and no request for additional instructions. The judge did not include the instructions above in the written instructions provided to the panel for use during their deliberations.

The government argued that appellant's touching of SB2 followed by the assault on SB1 was evidence of their conspiracy to commit rape, that "[JP] and [appellant] were out on the prowl," that their approach did not work with SB2, so they tried a different approach with SB1.

Defense counsel countered that appellant's behavior with SB2 was contrary to the government's argument that appellant was a sexual predator. That when told by SB2 to stop, he stopped, something a sexual predator would not do. In closing argument, defense counsel again reiterated that he had no objection to the DNA evidence, arguing that SB1 had voluntarily engaged in a threesome with appellant and JP.

Ten months after the trial's conclusion, the military judge attached a written denial of the defense request for expert assistance. There is nothing in the record or in her post-trial ruling to reflect that that this decision was ever communicated to the parties prior to the written ruling.

## LAW & DISCUSSION

*Expert Assistance*

We hold that appellant waived any issue relative to his request for expert assistance. Taken together, defense counsel's acquiescence in the judge's failure to issue a ruling on the matter of expert assistance prior to trial; appellant's stipulation as to the facts of the DNA testing at issue; and defense counsel's explicit endorsement of the reliability of the same in his presentation to the court-martial lead us to conclude that appellant waived any complaint he might have relative to the lack of DNA expert assistance in his defense. *See United States v. Whigham*, 72 M.J. 653, 659-61 (Army Ct. Crim. App. 2013); *United States v. Campos*, 67 M.J. 330, 332-33 (C.A.A.F. 2009). Just as a defense counsel's failure to renew a request

when invited to do so by a military judge waives the issue, so does acquiescence in a judge's failure to decide followed by an express decision not to contest the evidence at issue. *See United States v. Gunkle*, 55 M.J. 26, 32 (C.A.A.F. 2001); *United States v. Thomas*, 11 M.J. 388, 392 (C.M.A. 1981). We reiterate our expectation that defense counsel articulate any understanding that a litigated issue is preserved under circumstances such as these. *See Whigham*, 72 M.J. at 660 n.3; *see also Gunkle*, 55 M.J. at 32.

Secondly, if we were to hold the judge's failure to render a decision on the matter prior to trial against her, and interpret the record—including the judge's post-trial decision—to establish that all reasonably understood the judge to have denied appellant's request for expert assistance prior to trial, the question is nevertheless waived by the same stipulation and choice to advance a defense of consent and surrender any attack upon the reliability of the DNA evidence.

Appellant claims that he was compelled to choose the defense of consent because the judge foreclosed his exploration of the potential defense that the DNA evidence was unreliable. A judge's decision denying expert assistance compels no such choice. We do not deny that the denial of expert assistance may very well have undermined the strength of any defense or ability to so cross-examine, but in no way did it compel the choice to abandon attack upon the evidence in favor of a consent defense.[3] *See, e.g., Glebe v. Frost*, 135 S. Ct. 429 (2014) (per curiam) (addressing *potential* error if a judge *requires* the defense to choose between alternative theories).

To preserve this issue, appellant would have had to persist in an attack upon the reliability of the DNA evidence, cross-examined the government DNA experts accordingly, and relied on the fact that the victim could not identify him. *See Campos*, 67 M.J. at 332 n.3; *see also United States v. Gagan*, 43 M.J. 200, 204 (C.A.A.F. 1995) (appellant's actions at trial, including his failure to object to the testimony of a witness and his failure to renew his request for a witness as possible rebuttal testimony "undermine[d] his claim that the judge's exclusion of character evidence thwarted a central defense strategy."). If appellant had pursued this

---

[3] We also note that the defense counsel was not destitute in his ability to acquire some bit of education on the subject to better equip himself for interpretation of the DNA evidence and better arm himself for cross-examination, let alone a request for reconsideration on the issue. *See United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994) (defense counsel is expected to demonstrate that he is unable to gather and present evidence that an expert would be able to develop). Common experience establishes that a goodly amount of information on the subject is readily available.

approach, he would then be in a position to argue that the judge abused her discretion in denying his requested assistance because the linchpin of the government's case could very well have been that DNA evidence. *See, e.g., United States v. McAllister*, 55 M.J. 270, 276 (C.A.A.F. 2001). When, as in this case, appellant positively elicits testimony that makes the DNA analysis unimportant, he surrenders the chance. To hold that he was denied a fair trial because he otherwise might have been able to attack the validity of the DNA test results would make a mockery of the adversarial trial as a truthfinding process. *See United States v. Johnston*, 41 M.J. 13, 16 (C.M.A. 1994).[4]

We acknowledge the unenviable position that an accused soldier occupies in circumstances such as these; but, where an accused, through his own witness in presenting his defense, establishes the fact that the DNA evidence at issue is reliable, he has no basis to complain on appeal about the judge refusing his request for expert DNA assistance. In light of the presumption that defense counsel is competent, and our deference to his tactical choices, we find on this record that in the several weeks between the motions hearing and trial, the defense counsel consciously chose to abandon any defense based on faulty DNA analysis and opt for the defense of consent asserted. *See generally United States v. Mazza*, 67 M.J. 470, 474-75 (C.A.A.F. 2009).[5]

---

[4] Remarkably, appellant asserts that the judge compelled presentation of the "weaker" defense. This he posits despite his acknowledgement prior to trial that he was uncertain of the strength of the DNA defense and despite that, at trial, he positively vouched for the truth of the DNA report and evaluation.

[5] We also consider, if the matter were not waived, whether the judge abused her discretion by denying the request and hold otherwise. "[T]he accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial." *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008). The first prong of this test is reviewed by application of a three-part analysis. *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citing *Gonzales*, 39 M.J. at 461). While the parties effectively address the first prong—whether a DNA expert would have been of assistance to the defense—they neglect to effectively address the second, and we find that appellant failed to demonstrate a reasonable probability that denial of his requested expert would result in a fundamentally unfair trial. The judge is in no position to assess whether there is a reasonable probability that a defense expert is necessary or that an unfair trial would result absent the expert assistance when the defense counsel admits that despite any expert assistance, the alternative defense—one that necessarily admits that the DNA evidence is reliable—may nonetheless be the better. *See id.* at 99-100 (a defense

(continued . . .)

*Erroneous Spillover Instruction*

We agree with appellant that the judge issued an erroneous instruction on spillover. The final part of the judge's spillover instruction is confusing and rather difficult to decipher. Considering the previous discussion between judge and defense counsel on the subject, and in light of the fact that defense counsel made no objection or request for additional instruction after the judge issued the instruction, it may be that defense counsel was satisfied with that instruction.

However, because the danger exists that the members may have understood that instruction to mean that proof of the wrongful sexual contact carries with it the inference that appellant was also guilty of the charged rape, we review the error and test for prejudice. *See United States v. Guthrie*, 53 M.J. 103, 106-07 (C.A.A.F. 2000); *United States v. Baxter*, 72 M.J. 507, 513 (Army Ct. Crim. App. 2013). We are convinced that the error was harmless because it is "clear beyond a reasonable doubt that a rational [panel] would have found [appellant] guilty absent the error[.]" *Baxter*, 72 M.J. at 513 (quoting *United States* v. *DiPaola*, 67 M.J. 98, 102 (C.A.A.F. 2008)) (internal quotation marks omitted). In reaching this conclusion, we find no reasonable possibility that the incorrect instruction might have "contribute[d] to the [appellant's] conviction." *United States v. Davis*, 73 M.J. 268, 271 (C.A.A.F. 2014).

First, the defense theory of the case consciously employed evidence relevant to the charged wrongful sexual contact to argue that appellant was not guilty of the charged rape. Excision of the final confused instruction from the judge would therefore add little, if anything, to the defense's trial strategy. *See Guthrie*, 53 M.J. at 106.

Second, the government convicted appellant with evidence completely separate and distinct from the evidence relevant to the charge of wrongful sexual contact. We are, therefore, confident that appellant was not convicted of rape based on evidence of a general criminal disposition. *See id.* at 106-07.

Finally, the evidence relevant to the charged wrongful sexual contact was also relevant to the charged conspiracy and the charged rape as evidence of a pattern of lustful intent and was offered for that purpose. Though the government argued, in a hearing outside the presence of the members, that the evidence was relevant

---

(. . . continued)

request for an expert based on the desire for an expert to explore all possibilities is insufficient to show necessity); *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010) (equating the second prong with a bar to prosecution because of outrageous government conduct).

propensity evidence, trial counsel never made any reference or argument before the panel members to or about propensity evidence. The government never characterized the evidence as propensity evidence and did not present the evidence relevant to the one charge as evidence of appellant's propensity or predisposition to criminal activity generally. Rather, trial counsel presented the evidence as simply relevant to establish appellant's lustful intent. *See United States v. Tanksley*, 54 M.J. 169, 175 (C.A.A.F. 2000), *overruled on other grounds by United States v. Inong*, 58 M.J. 460, 464 (C.A.A.F. 2003). We are, therefore, confident that the confused instruction worked no prejudice to appellant under these circumstances.[6]

*Sufficiency of the Evidence*

Finally, having fulfilled our responsibilities under Article 66(c), UCMJ, we are convinced beyond any reasonable doubt that appellant committed the charged act of rape and are thus equally convinced of the sufficiency of the evidence necessary to affirm the lesser-offense affirmed by the convening authority acting under his Article 60, UCMJ, authority. *See United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The victim provided credible testimony, corroborated by medical evidence, and additional testimony was elicited from third parties describing her distraught state and establishing her character and reputation for truthfulness. Our review of the evidence in its entirety, to include appellant's defense of consent as raised by the testimony of his accomplice and impeachment of the victim, leaves no reasonable doubt in our minds.[7]

---

[6] Similarly we find no merit in appellant's contention that he was prejudiced by the judge's failure to provide analysis and instructions relative to character and propensity evidence under Military Rules of Evidence 404 and 413. At trial, appellant made no clear objection to the lack of either a 413 or 404 instruction or analysis and, as described above, the lack of either or both does not constitute plain error under the circumstances of this case in any event. *See United States v. Payne*, 73 M.J. 19, 22-23 (C.A.A.F. 2014)

[7] Admission of the nurse's testimony to the effect that the bruising on SB1 was more consistent with nonconsensual sex than consensual sex cannot constitute plain error under the circumstances. It is reasonable for experts to offer opinions about whether someone's description of their condition is consistent with scientific evidence accumulated on the subject. *See, e.g., United States v. Davis*, 49 M.J. 79, 82 (C.A.A.F. 1998) (citing *United States v. Utter*, 97 F.3d 509, 512 (11th Cir. 1996)); *United States v. Traum*, 60 M.J. 226, 235 (C.A.A.F. 2004) (citing *United States v. White*, 23 M.J. 84, 87 (C.M.A. 1986)); *United States v. Flesher*, 73 M.J. 303, 314 n.6

(continued . . .)

The evidence upon which the convening authority approved appellant's conviction for aggravated sexual assault is legally and factually sufficient. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Washington*, 57 M.J. at 399.

## CONCLUSION

The findings of guilty and the sentence as approved are AFFIRMED.

Senior Judge LIND and Judge PENLAND concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

(. . . continued)
(C.A.A.F. 2014); *United States v. Pabon*, 42 M.J. 404, 406-07 (C.A.A.F. 1995); *see also* Military Rules of Evidence 702-703. Also, we find no merit to appellant's contention that the admission of hearsay statements from SB1's mother to the nurse was an abuse of discretion. *See generally United States v. Cucuzzella*, 66 M.J. 57, 59-60 (C.A.A.F. 2008); *United States v. Giambra*, 38 M.J. 240, 242 (C.M.A. 1993) (citing *United States v. Weeks*, 20 M.J. 22, 25 (C.M.A. 1985)).