UNITED STATES, Appellee

v.

Rogelio M. MAYNULET, Captain
U.S. Army, Appellant

No. 09-0073

Crim. App. No. 20050412

United States Court of Appeals for the Armed Forces

Argued October 13, 2009

Decided March 3, 2010

BAKER, J., delivered the opinion of the Court, in which EFFRON, C.J., and ERDMANN, STUCKY, and RYAN, JJ., joined.


<u>Counsel</u>

For Appellant:  <u>Frank J. Spinner</u>, Esq. (argued); <u>Major Timothy W. Thomas</u> (on brief); <u>Colonel Mark Tellitocci</u>, <u>Lieutenant Colonel Matthew M. Miller</u>, and <u>Major Grace M. Gallagher</u>.

For Appellee:  <u>Captain James T. Dehn</u> (argued); <u>Colonel Norman F. J. Allen III</u>, <u>Lieutenant Colonel Martha L. Foss</u>, <u>Major Sara M. Root</u> (on brief); <u>Captain Philip M. Staten</u>.


Military Judge:  James L. Pohl


<u>**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION**</u>.

Judge BAKER delivered the opinion of the Court.

A general court-martial composed of members convicted Appellant, contrary to his pleas, of assault with intent to commit voluntary manslaughter in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). The members sentenced Appellant to dismissal from the service. The convening authority approved the findings and the sentence as adjudged. The United States Army Court of Criminal Appeals affirmed. United States v. Maynulet, No. ARMY 20050412 (A. Ct. Crim. App. Aug. 8, 2008).

On Appellant's petition, we granted review of the following issue:

I. WHETHER THE MILITARY JUDGE ERRED WHEN HE REFUSED TO INSTRUCT THE MEMBERS ON THE DEFENSE OF MISTAKE OF LAW.

For the reasons set forth below, we conclude that the military judge did not err.

## BACKGROUND

Appellant commanded an armor company in Iraq during Operation Iraqi Freedom. On May 21, 2004, Appellant and his company were instructed to set up a traffic control point to support an operation to capture or kill a high-value target (HVT). A vehicle transporting the HVT sped past the check point. After a high-speed chase the vehicle carrying the HVT crashed into a wall and then into a nearby house. Appellant and

several soldiers approached the crash site.  Several doors of the vehicle were open, indicating the passengers may have fled inside the house.

Appellant sent part of his team into the house to search for the target, ordered the medic to evaluate the wounded driver, who was still in the vehicle, and ordered another soldier to search the vehicle for weapons.  The medic pulled the driver from the vehicle.  At trial, the medic testified "He was inside the vehicle. . . . I opened the door and pulled him out. . . . I told Captain Maynulet he wasn't going to make it."

Appellant received a radio communication that a detainee inside the house required medical attention and sent the medic inside the house.  The medic was then asked at trial about his plan for the injured driver, "To bring [the other detainee] back; . . . and see what I could do for the driver.  I'm not sure there was much I could do."

Appellant saw that the driver had a head wound, was making a gurgling sound, and was flapping his arm.  The driver was laying inert on the ground and had no weapon nearby.  Appellant made no attempt to aid the driver, nor did he attempt to contact his command.  Several minutes passed.  Appellant radioed his unit to stand by for friendly fire.  He discharged two rounds at the driver's head.  The first shot missed.  Appellant then stepped back to take a second shot, which killed the driver.

At trial Appellant testified that he shot the driver "to put him out of [his] misery." The following exchange took place:

Q.   So, did you fire again?

A.   Yes, I did.

Q.   Why did you do that?

A.   He was in a state that I didn't think was dignified. I had to put him out of [his] misery.

Q.   Were you authorized to do that?

A.   I think I was.

Q.   Why?

A.   It was the right thing to do. I think it was the honorable thing to do. I don't think allowing him to continue in that state was proper.

Prior to deployment, Appellant received training on the Law of War (LOW) and the Rules of Engagement (ROE). This training consisted of a slide show presentation and a question and answer session presided over by operational law attorneys, brigade trial counsel, and other judge advocates. Throughout his deployment, Appellant carried a CFLCC (Coalition Forces Land Component Command) ROE Card that stated:  "Do not engage anyone who has surrendered or is out of battle due to sickness or wounds."[1]  A line at the bottom of the card specified the

---

[1] Appellant received an ROE card from CFLCC during this pre-deployment briefing, which he later carried in his uniform.

durational element of the ROE: "These ROE will remain in effect until your commander orders you to transition to post-hostilities ROE."

At trial the military judge denied a defense request that the members be instructed on the defense of mistake of law. Specifically, defense counsel argued that Appellant believed, albeit mistakenly, that he was acting in a manner consistent with the legal training he had received prior to deployment. During a colloquy with the military judge, he explained that "mistake of law may be a defense when the mistake results in the reliance on the decision or announcement of authorized public official or agency." Later during the same colloquy he stated:

> [W]hen Captain Maynulet was told that this guy was going to die and there was nothing that could be done, right, he was guided not by care of the wounded, not to shoot somebody who was out of the battle due to sickness or wounds, but he's guided by preventing unnecessary suffering, and that's what was taught at the briefings, and that's what's in the law.

In justifying his decision to reject Appellant's request for a mistake of law instruction, the military judge responded:

> I can find no authority that would permit a mistake of law defense to apply in this case, based on what I have. . . . [S]ince it's not a recognized defense under these circumstances, although there is evidence raised of why he did it, that goes to mitigations and motive, but it does not go to a defense. So, at this point in time, I do not believe a mistake of law

---

After Appellant deployed, whenever there was a change to the ROE card a new card was issued.

defense would apply to this case and as such, I will
not instruct on it . . . .

ANALYSIS

"'The question of whether a jury was properly instructed
[is] a question of law, and thus, review is de novo.'" United
States v. McDonald, 57 M.J. 18, 20 (C.A.A.F. 2002) (alteration
in original) (citation omitted). Generally, a military judge
has "'substantial discretionary power'" to decide whether to
issue a jury instruction. Id. (citation omitted). However, a
military judge has a sua sponte duty to instruct on an
affirmative defense if reasonably raised. United States v.
Davis, 53 M.J. 202, 205 (C.A.A.F. 2000); Rules for Courts-
Martial (R.C.M.) 916(d); R.C.M. 920(e)(3); see McDonald, 57 M.J.
at 20 (a military judge has this duty even if the instruction
was not requested). "The test whether an affirmative defense is
reasonably raised is whether the record contains some evidence
to which the court members may attach credit if they so desire."
Davis, 53 M.J. at 205 (citation omitted).

Appellant claims he was entitled to a mistake of law
instruction because he was taught to "eas[e] suffering" during
his pre-deployment briefing on the LOW. Specifically, Appellant
argues that the briefing's instruction to ease suffering, simply
stating "Humanity – unnecessary suffering," was confusing and
induced him to put the driver out of his misery by shooting him

in the head.  Accordingly, Appellant asserts the military judge erred by refusing to allow the members to determine whether mistake of law was a defense in his case.

It is well settled in civil and military law that mistake of law is generally not a defense to criminal conduct.  R.C.M. 916(l)(1) states the following:  "Ignorance or mistake of law, including general orders or regulations, ordinarily is not a defense."  See also Lambert v. California, 355 U.S. 225, 228 (1957).  There are a few narrow exceptions to the general rule. One such exception exists when "the mistake results from reliance on the decision or pronouncement of an authorized public official or agency."  R.C.M. 916(l)(1) Discussion. However, "reli[ance] on the advice of counsel that a certain course of conduct is legal is not, of itself, a defense."  Id. In civilian practice, this defense is more generally stated as a "reasonabl[e] reli[ance] upon an erroneous official statement of the law."  1 Wayne R. Lafave, Substantive Criminal Law § 5.6(e)(3), at 415 (2d ed. 2003); see also Joshua Dressler, Understanding Criminal Law § 13.02[B][2], at 182 (4th ed. 2006).

While the concept alluded to in the discussion to R.C.M. 916(l)(1) is well established in the law, see, e.g., Cox v. Louisiana, 379 U.S. 559, 568-71 (1965), this Court has yet to hear a case directly relying on this exception.

The problem with Appellant's argument is that the record is devoid of any erroneous pronouncement or interpretation of military law or the law of armed conflict upon which he could have reasonably relied to justify his killing of the injured driver. The best Appellant can argue is that he had a subjective mistaken belief as to what the law allowed. However, this is the very kind of mistake rejected by the general rule regarding mistake of law.

Specifically, Appellant claims Slide 18 of the LOW presentation justifies his action. Slide 18 reads: "Humanity – unnecessary suffering." The next line on the same slide states "Effective," referring to the LOW, because it "motivates enemy to observe same rules." Also, the instructor notes for Slide 18 state: "[M]ake sure they understand that an enemy breach does not allow us to breach." However, Slide 18 was presented in the context of a longer presentation, including Slide 24 stating, "(4) Soldiers collect and care for the wounded, whether friend or foe." Thus, read with Slide 24, Slide 18 appears to stand for a proposition inapposite to what Appellant argues.

The ROE card, which Appellant carried in his pocket during combat, is even clearer. It states: "Do not engage anyone who has surrendered or is out of battle due to sickness or wounds." This ROE card, unambiguous as it is, would appear to supersede

8

anything Appellant argues he might have learned as part of general training.

Appellant argues that the slides he claims to have relied upon were confusing. This argument is equally unavailing. The slides include clear and comprehensible phrases such as "Violations are Punishable," "Soldiers collect and care for the wounded, whether friend or foe," and "'The Armed Forces of the United States will comply with the law of war during the conduct of all military operations and related activities in armed conflict . . . .'" Appellant was a Captain in the Army, a commissioned officer, and a college graduate. There was no testimony that any other members of the unit, who were Appellant's enlisted subordinates, were confused by the slides or the ROE card.

Also notably absent from the record is any evidence that Appellant received affirmative assurances from briefers or anyone in his chain-of-command that "mercy killing" was lawful. To the contrary, the ROE card specifically instructed him not to engage enemy combatants who were out of battle due to wounds. Moreover, Appellant had time to consult with both his command and with medical authorities if he felt that additional legal, medical, or command guidance was needed before deciding how to proceed.

For the reasons stated above, we hold that the military judge did not err in refusing to instruct in accordance with Appellant's request at trial.[2]

CONCLUSION

The decision of the United States Army Court of Criminal Appeals is affirmed.

---

[2] Appellant also argues his reliance on a government official's pronouncements provided him with the defense of entrapment by estoppel. In an estoppel situation, the government is rightly barred from obtaining a conviction because the government -- through its representatives acting in an official capacity -- is responsible for the defendant's inability to know that his conduct was proscribed. Lafave, supra, § 5.6(e), at 412; see also Cox, 379 U.S. at 571. Whether entrapment by estoppel and the military defense of "mistake of law" are the same or distinct concepts in total is an issue we need not address in this case. This case is governed by military law and in any event the concepts are parallel in reach as raised in this case. As we have concluded, there is no evidence in the record to support the claim that there was an official decision, pronouncement or interpretation, later determined to be erroneous, upon which he could have reasonably relied or that could have formed the basis of a claim of estoppel.