# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————

**No. 201600091**

———————————

## UNITED STATES OF AMERICA
Appellee

v.

## DONALD L. WILLIAMS III
Lance Corporal (E-3), U.S. Marine Corps
Appellant

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel Elizabeth A. Harvey, USMC.
Convening Authority: Commanding General, 1st Marine Division (REIN) Camp Pendleton, CA.
Staff Judge Advocate's Recommendation: Lieutenant Colonel D.C. Young, USMC.
For Appellant: Philip D. Cave, Esq.; Lieutenant Doug Ottenwess, JAGC, USN.
For Appellee: Lieutenant Commander Jeremy R. Brooks, JAGC, USN; Lieutenant Taurean K. Brown, JAGC, USN.

———————————

Decided 12 September 2017

———————————

Before GLASER-ALLEN, MARKS, and HUTCHISON, *Appellate Military Judges*

———————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————

GLASER-ALLEN, Chief Judge:

At a contested general court-martial, officer and enlisted members convicted the appellant of one specification each of violating a general order, fleeing apprehension, operating a vehicle while drunk, and involuntary manslaughter, violations of Articles 92, 95, 111, and 119, Uniform Code of

Military Justice (UCMJ), 10 U.S.C. §§ 892, 895, 911, and 919 (2012).[1] The members sentenced the appellant to 14 years' confinement, reduction to paygrade E-1, forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority (CA) approved the findings and sentence adjudged and, except for the punitive discharge, ordered it executed.

The appellant raises seven assignments of error (AOEs):[2] (1) the evidence is legally and factually insufficient to support his conviction for fleeing apprehension under Article 95, UCMJ; (2) the military judge committed instructional error by declining to find that Article 95, UCMJ, is a specific intent offense; the military judge erred by denying: (3) the defense request for trial delay to accommodate a defense expert; (4) Staff Sergeant (SSgt) N as a defense witness; (5) the defense motion to dismiss for unlawful command influence (UCI); (6) the defense challenge to Lieutenant Colonel (LtCol) D as a member; and (7) the motion to merge Charges III and IV in sentencing for unreasonable multiplication of charges.[3]

We conclude the findings are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

The majority of the facts in this case are undisputed. On 7 November 2014, despite being under 21 years old, the appellant began the evening drinking in his barracks room on board Marine Corps Base, Camp Pendleton, California. After consuming "Jameson and Coke,"[4] he drove to an on-base party around 1830, arriving visibly intoxicated. He consumed more alcohol at the party. His friends noticed his level of intoxication, took away his alcohol, and tried to stop him from driving. Although he had agreed to stay the night, he later went to his truck to retrieve cigarettes. He then left the party and drove toward his barracks, close to San Mateo road.

At approximately 2030, the appellant was driving at such a high rate of speed, and with his engine revving so loudly, that he drew the attention of Officer JB of the Camp Pendleton Marine Corps Police Department. Officer JB heard the vehicle "accelerating very hard and very loud and then it. . .

---

[1] The members acquitted the appellant of one specification of assault under Article 128, UCMJ.

[2] We have renumbered the appellant's AOEs. The record is submitted on its merits regarding the Article 92, 111, and 119, UCMJ, offenses.

[3] The appellant raises AOEs III-VII pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] Record at 352, 362-63.

went down San Mateo road . . . at 50 to 60 miles an hour."[5] The speed limit on San Mateo Road was 25 miles per hour.

Officer JB began looking for the vehicle and found it pulled over by a stop sign. He attempted to initiate a stop by pulling up perpendicular to the appellant's truck so his police car faced the driver's side door and turning on "the red and blue flashing lights on top of the car" and the white takedown lights, but not the siren.[6] The appellant looked in Officer JB's direction but then sped off, swerving across the centerline. His tires made a loud screeching noise and left rubber marks about 30-50 feet in length on the pavement. Officer JB immediately pursued the appellant's truck with his red and blue lights on.

Witnesses from the barracks saw the appellant's truck coming down the road and heard the appellant's truck increasing in speed. SSgt MM, the Assistant Officer of the Day, went outside the barracks after hearing the appellant's truck. He heard the appellant's truck engine revving, "loud— louder than what it was before . . . kind of, like trying to get away type."[7] He believed the appellant was "trying to get away from the MPs."[8] The appellant's truck was estimated to be traveling approximately 62 miles per hour.

As the appellant was increasing his speed, First Lieutenant (1stLt) MD was driving a duty van on the same road. The appellant crashed into the rear of the duty van, killing 1stLt MD almost instantly. 1stLt MD died from multiple blunt force injuries and was pronounced dead shortly after the collision. At the scene, multiple witnesses smelled alcohol and observed that the appellant was intoxicated. The appellant was unable to complete a field sobriety test, and later tests put his blood alcohol content at the time of impact between 0.295 and 0.34. The appellant was emotional, expressed remorse, and was able to talk coherently with first responders and others gathered at the scene. Later, while in custody, he told Naval Criminal Investigative Service (NCIS) agents, in a voluntary sworn statement, that he had only consumed whisky, that alcohol had not been a major factor in the accident, and that he may have been speeding but the accident occurred because he was paying more attention to the radio than the road. The appellant claimed that he did not recall seeing or hearing Officer JB at the stop sign or behind him prior to the collision.

---

[5] *Id.* at 130.

[6] *Id.* at 131-32; Prosecution Exhibit (PE) 16 (both video clips).

[7] Record at 204.

[8] *Id.* at 205.

## II. DISCUSSION

### A. Legal and factual sufficiency

The appellant contends the prosecution offered legally and factually insufficient evidence for his fleeing apprehension conviction because the government "failed to prove beyond a reasonable doubt either that Officer JB 'attempted to apprehend' [a]ppellant—as defined in the Military Judge's instruction—or that [a]ppellant 'fled' from any such attempted 'apprehension.'"[9] We disagree.

We review questions of legal and factual sufficiency *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is whether, "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. We may "judge the credibility of witnesses, and determine controverted questions of fact," and substitute our judgment for that of the fact finder. Art 66(c), UCMJ; *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990). While this is a high standard, the phrase "beyond a reasonable doubt" does not imply that the evidence must be free from conflict. *Rankin*, 63 M.J. at 557 (citation omitted).

The military judge instructed the members that to convict the appellant of Article 95, UCMJ, fleeing apprehension, the government had to prove that:

(1) Officer JB attempted to apprehend the appellant;

(2) Officer JB was authorized to apprehend the appellant; and

---

[9] Appellant's Brief of 8 Aug 2016 at 12.

(3) The appellant fled from the apprehension.

Record at 398; Appellate Exhibit (AE) XXXI at 1-2. The military judge defined "apprehension" for the members as:

> . . . [T]aking a person into custody; that is, placing a restraint on a person's freedom of movement. The restraint may be physical and forcible, or it may be imposed by clearly informing the person being apprehended that he is being taken into custody. *An apprehension is attempted, then, by clearly informing a person orally or in writing that he is being taken into custody or by attempting to use a degree and kind of force which clearly indicates that he is being taken into custody* (emphasis added). Flight from apprehension must be active, such as running or driving away from the person attempting to apprehend the accused.

Record at 398; AE XXXI at 2.

The military judge went on to explain that ignorance of the attempted apprehension could be a defense and that the appellant's intoxication could be considered regarding whether he knew of Officer JB's apprehension efforts.

The parties agree that the second element was satisfied by the evidence; leaving the first and third elements at issue. The appellant argues his conviction is legally insufficient because the government failed to prove these elements as the record "is devoid of any evidence that would show Officer [JB] had probable cause to arrest [a]ppellant" and that there was not evidence beyond a reasonable doubt to demonstrate that Officer [JB] clearly informed the appellant that he was being taken into custody.[10] We find this argument without merit.

While there are few cases on point regarding fleeing apprehension, RULE FOR COURTS-MARTIAL (R.C.M.) 302(d)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) notes that "[a]n apprehension . . . may be implied by the circumstances." Probable cause to apprehend exists when officers have knowledge of facts or circumstances to warrant a reasonable belief the suspect has committed or was committing a crime. *United States v. Schneider*, 14 M.J. 189, 194 (C.M.A. 1982).

Courts have also found that "when an oral or written order is not given a suspect by a person lawfully attempting to apprehend him, the government must establish that the circumstances were such as would lead a reasonable [person] in the same position to conclude that an attempt was being made to apprehend him." *United States v. Noble*, 2 M.J. 672, (A.F.C.M.R. 21 Sep

---

[10] *Id.*

1976); *see United States v. Gary*, No. 9901196, 2003 CCA LEXIS 86, at *10 (N-M. Ct. Crim. App. 31 Mar 2003) (finding that the "circumstances must convey the message to an accused that he is about to be apprehended." (citing *United States v. Diggs*, 52 M.J. 251, 255 (C.A.A.F. 2000)). In *United States v. Harris*, the Court of Military Appeals, recognized that "[t]he law regarding apprehension . . . does not turn on the police officer's subjective motive[;]" but rather, on "what [the police officer] communicated to the appellant." 29 M.J. 169, 171 (C.M.A. 1989) (citing *United States v. Sanford*, 12 M.J. 170, 174 (C.M.A. 1981). Applying this standard, the *Harris* court held that "the hot pursuit by a police car with lights and sirens . . . gave Harris ample reason to believe that a police officer was trying to apprehend him." *Id.* Although *Harris* was a resisting, vice fleeing, apprehension case under an older version of Article 95, UCMJ, it is relevant because it explains that hot pursuit may qualify as a circumstance that would lead a reasonable person to conclude an attempt was being made to apprehend him. So, too, here.

Officer JB testified that the first time he saw the appellant's truck, he was conducting another traffic stop. He witnessed the appellant speeding down the street at over twice the speed limit while also violating other traffic laws. After Officer JB finally found the appellant pulled over by a stop sign, he drove up perpendicular to the appellant's truck, faced the driver's side door, and then turned on his blue and red code lights and his white takedown lights—an offensive position clearly establishing the officer's presence.[11] Indeed, the red and blue lights from Officer JB's police car are visibly

---

[11] "Q. What happened when you were attending to that call?

A. We heard a vehicle accelerating very hard and very loud and then it . . . went down San Mateo Road . . . at a high rate of speed. I estimate 50 to 60 miles an hour.

Q. What is the posted [speed] limit out there?

A. Twenty-five on that street.

Q. How did you respond?

A. I was pretty much done with the call . . . I got in my patrol car, went . . . looking for the vehicle. . . . I got up by the swim tank and that's where I saw the truck. My recollection is the truck was sitting at the stop sign. . . . I started a traffic stop at that point in time.

. . .

Q. And as far as you know, based on what you could see, did he see you?

A. He looked, to me, like he looked at me. "

Record at 130-31; 133.

reflecting off the appellant's white truck in the police car's dashboard camera video:

> Q. And what do we see happening next here?
>
> A. That's where he peeled out. It was . . . he left, probably 30 to 50 feet of rubber as he was burning out. . . . I didn't see any brake lights and it appeared like it was pedal all the way to the floor the entire time.
>
> . . .
>
> Q. What are we looking at here?
>
> A. We're on San Mateo Road now. I was following him. That's where I was calling in . . . I was trying to do a traffic stop and the driver took off.
>
> . . .
>
> Q. All right. And what's the point of the red and blue lights?
>
> A. That's to indicate that there is law enforcement in the area and you should pull over and stop.
>
> Q. Did he pull over and stop?
>
> A. No, he did not.
>
> Q. You said you didn't see the van pull out. At that point, were you disengaging?
>
> A. What do you mean disengaging'?
>
> Q. Were you decelerating? Were you starting to slow down?
>
> A. I didn't start decelerating until I saw the actual crash happen, and then I went into self-preservation mode.[12]

Although the appellant claims to not recall seeing Officer JB, noticing the flashing lights, or the high-speed pursuit prior to the accident, he concedes that in the video he appears to look over toward the police car before Officer JB had a chance to get out of his vehicle. He also acknowledges that he drove off, with a screeching noise, down the road before Officer JB could talk with him, leaving rubber tire marks of 30-50 feet on the pavement:

> Q. Okay. Does it appear that your head looks over towards that car?
>
> A. I believe so, sir.

---

[12] *Id.* at 133-34; 141.

Q. Okay. And then, as we know, you peel out and takeoff; correct?

A. Yes, sir.[13]

Officer JB immediately followed the appellant down the road at approximately 70 miles per hour, accelerating to catch up to him with lights flashing, but no siren. The chase ended shortly thereafter, when the appellant's truck struck the duty van driven by 1stLt MD.

The evidence shows that Officer JB used "a degree and kind of force which clearly indicate[d]" to the appellant that Officer JB was attempting to apprehend him as required by the military judge's instructions.[14] Probable cause to apprehend the appellant was established after Officer JB observed the appellant's truck driving at a high rate of speed—nearly twice the posted speed limit—in the vicinity of the barracks. With this probable cause, Officer JB pulled up to the appellant's truck with all of his police identification equipment on except his siren; but before he could exit his police car, the appellant looked at him and pulled away in a manner suggesting the appellant was trying to evade apprehension. Finally, the appellant continued to speed down the road in what appeared to be a continuing attempt to evade Officer JB, despite being pursued at a high speed and with police car lights flashing. His flight ended only when he rammed the duty van. All of this evidence is proven by not only witness testimony, but also by the dashboard video camera footage from Officer JB's car presented in Prosecution Exhibit (PE) 16.

Viewed in the light most favorable to the prosecution, a reasonable factfinder could have determined this combination of the offensive positioning of the police car in an attempt to stop the appellant, followed by the appellant's sudden exit to avoid the situation, and Officer JB's resulting hot pursuit of the appellant's truck not only demonstrated probable cause to arrest the appellant, but also circumstances that would lead a reasonable person in the same position to conclude that an attempt was being made to apprehend him. We are satisfied the evidence that the appellant was fleeing apprehension was legally sufficient.

Similarly, we find that Officer JB was conducting much more than a simple traffic stop and that the appellant knew, despite his alcohol consumption, that Officer JB was attempting to apprehend him. Further, we find that after seeing the police car, the appellant fled Officer JB's attempted apprehension when he sped away and continued to drive down the road at a

---

[13] *Id.* at 370-71.

[14] AE XXXI.

high rate of speed despite being pursued by Officer JB. Thus, having weighed all the evidence and having made allowances for not having observed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt of fleeing apprehension.

## B. Specific intent and voluntary intoxication instruction

The appellant further contends that the military judge erred when she "declined to find a specific intent was required and focused her instruction on a need to prove knowledge on the part of [a]ppellant" with regard to the same fleeing apprehension charge.[15] The appellant also argues that limiting the voluntary intoxication defense to rebutting the first element of the offense— that the appellant "knew that Officer JB was attempting to apprehend him"[16]—was error.[17] We disagree.

Whether members were properly instructed is a question of law we review *de novo. United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014). A military judge's decision to give, or not give, an instruction is reviewed for an abuse of discretion. *United States v. Maxwell*, 45 M.J. 406, 424 (C.A.A.F. 1996). The abuse of discretion standard calls for more than a mere difference of opinion; the challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010). "'The military judge must bear the primary responsibility for assuring that the jury properly is instructed on the elements of the offenses raised by the evidence as well as potential defenses and other questions of law.'" *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008) (quoting *United States v. Graves*, 1 M.J. 50, 53 (C.M.A. 1975)).[18] Generally, a military judge has

---

[15] Appellant's Brief at 38.

[16] Record at 402-03; AE XXXI at 5.

[17] The appellant argued, as he does now, that the offense is a specific intent offense and as such, warrants the voluntary intoxication defense: "So we're one hundred percent onboard with the ignorance instruction as you drafted it. But we'd also request an instruction pertaining to voluntary intoxication if it is to such a degree that it negates the specific intent to flee, which is 5-12 in your benchbook." Record at 388.

[18] "A military judge must instruct members on any affirmative defense that is 'in issue.'" *United States v. Schumacher*, 70 M.J. 387, 389 (C.A.A.F. 2011) (citation omitted). An affirmative defense is "in issue when some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose." *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007) (citations and internal quotation marks omitted)). "We review the judge's decision to give or not give a specific instruction, as well as the substance of any instructions given, to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence." *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (citations and internal quotation marks omitted).

substantial discretionary power to decide whether to issue a jury instruction. *United States v. Maynulet*, 68 M.J. 374, 376 (C.A.A.F. 2010).

While the military judge has wide discretion in choosing the instructions to give, the instructions must provide an "accurate, complete, and intelligible statement of the law." *United States v. Behenna,* 71 M.J. 228, 232, (C.A.A.F. 2012) (citations omitted). Instructions should be "tailored to fit the circumstances of the case," R.C.M. 920(a), Discussion, and provide "lucid guideposts" to enable the court members to apply the law to the facts. *United States v. Buchana*, 41 C.M.R. 394, 396-97 (C.M.A. 1970).

The sole specification of Charge II alleges the appellant "did . . . flee apprehension by Provost Marshall Officer [JB] . . . a person authorized to apprehend the said [LCpl] Williams."[19] Contrary to the appellant's argument, while the elements of Article 95, UCMJ, fleeing apprehension, require an accused's knowledge of an officer's attempt to apprehend, they do not clearly require a specific intent to flee. *See* R.C.M. 307(c)(3), Discussion at ¶ (G)(i); *United States v. McGuire*, 2012 CCA LEXIS 28, *29-35, (N-M. Ct. Crim. App. 31 Jan 2012) (reversed in part on other grounds), 71 M.J. 357 (C.A.A.F. 2012). We find no such language that qualifies as "specific intent" in the statute criminalizing flight from apprehension, as set forth in the MCM, or in the Military Judges' Benchbook instructions.[20]

The Supreme Court has recently considered *mens rea* requirements when a statute is unclear:

> The Court does not regard "mere omission from a criminal enactment of any mention of criminal intent" as dispensing with such a requirement. *Morissette* v. *United States*, 342 U.S. 246, 250 . . . . This rule of construction reflects the basic principle that "wrongdoing must be conscious to be criminal," and that a defendant must be "blameworthy in mind" before he can be found guilty. *Id.* at 252. . . . Thus, criminal statutes are generally interpreted "to include broadly applicable scienter requirements, even where the statute . . . does not contain them." *United States* v. *X-Citement Video, Inc.*, 513 U.S. 64, 70 . . . . In some cases, a general requirement that a defendant act knowingly is sufficient, but where such a requirement "would fail to protect the innocent actor," the statute "would need to be read to require . . . specific intent." *Ibid.* Pp. ___ - ___, 192 L. Ed. 2d, at 12-15.

---

[19] Charge Sheet.

[20] Military Judges' Benchbook, Dept. of the Army Pamphlet 27-9 at 277-78 (10 Sep 2014).

*Elonis v. United States*, 135 S. Ct. 2001, 2003 (U.S. 2015) (internal citations omitted).

The parties agree that military courts have not yet directly addressed whether fleeing apprehension is a specific intent crime. The appellant offers nothing beyond *United States v. Lawson*, No. 201300294, 2014 CCA LEXIS 379 (N-M. Ct. Crim. App. 30 Jun 2014) and *United Sates v. Pritt*, 54 M.J. 47, 50 (C.A.A.F. 2000) to support his contention. While both cases discuss Article 95, UCMJ, they were guilty pleas that did not directly address the issue of specific intent, and ultimately were resolved on other grounds. However, *Lawson* did provide a general framework for the military judge here to find that the Article 95, UCMJ, fleeing apprehension scienter is knowledge of attempted apprehension rather than a specific intent to flee.[21]

We have previously discussed the nuances of general and specific intent crimes and their interplay with the voluntary intoxication instruction. "Voluntary intoxication is not a defense to a general-intent crime, but it may raise a reasonable doubt about actual knowledge, specific intent, willfulness, or premeditation when they are elements of a charged offense. *See* R.C.M. 916(l)(2). Specific intent 'involves a further or ulterior purpose beyond the mere commission of the act.'" *McGuire*, 2012 CCA LEXIS 28, *31-32 (citation omitted).

Noting the dearth of case law on Article 95, UCMJ, and no clear indication regarding intent in the statute as commonly seen in other specific intent offenses such as larceny, the military judge here thoughtfully settled on a compromise to protect the appellant's rights.[22] She provided an instruction on ignorance and voluntary intoxication regarding the implied knowledge of an attempt to apprehend, but she did not instruct the members

---

[21] "The appellant argues that flight from apprehension is such an offense, in that one cannot 'be said to be fleeing apprehension if they do not know someone is attempting to apprehend them.'. . . While the court finds the appellant's argument colorable, we need not decide in this case whether flight from apprehension is a specific-intent offense because the facts indicate that the appellant was not, at the time of the offense, sufficiently impaired to call her guilty plea into question." *Lawson*, 2014 CCA LEXIS 379, at *5 (internal citation omitted).

[22] "I don't think it's a specific intent issue. I think it's more of a knowledge issue, which I think it's how -- it's, kind of, been framed, knowledge of the attempt to apprehend." Record at 383.

"Same thing here, the intending to flee just accomplishes the general intent required for the specification. . . . So I don't find that there is some specific other intent beyond the mental state required with respect to the actus reus of the crime in this case. So that is why I don't find there to be a need for voluntary intoxication as it relates to the specific intent to flee." *Id.* at 394.

that they could find the accused too intoxicated to form the specific intent to flee.[23]

Again, we need not reach the issue of whether Article 95, UCMJ, is a general or specific intent crime. The military judge properly researched the issue, followed the existing law, and protected the appellant's rights by providing both the ignorance and voluntary intoxication instruction regarding knowledge in the first element of the offense. She understood her responsibility to protect an innocent actor who was simply unaware that he was being followed by the police and incorporated a knowledge requirement as discussed in *Lawson*. Therefore, the military judge's decision to incorporate a general intent, knowledge mens rea was appropriate based on the facts of the case and not an abuse of discretion.[24]

Assuming, *arguendo*, that the military judge erred in failing to instruct the members that, in order to return a guilty finding, they must be convinced beyond reasonable doubt that the appellant had the specific intent to flee and that his voluntary intoxication also applied to that scienter, we find that such error did not materially prejudice the substantial rights of the appellant and was "harmless beyond a reasonable doubt."[25]

The appellant has offered no impact the allegedly erroneous instruction had on his case. This is likely because he had no objection to the ignorance instruction at trial, and while the military judge limited the voluntary intoxication instruction to the first element of the offense regarding

---

[23] "If the accused at the time of the offense was ignorant of the fact that Officer [JB] was attempting to apprehend him, then he cannot be found guilty of the offense of fleeing apprehension.. . .The evidence has raised the issue of voluntary intoxication in relation to the offense of fleeing apprehension. I advised you earlier that the accused must have known that Officer [JB] was attempting to apprehend him. In deciding whether the accused had such knowledge at the time you should consider the evidence of voluntary intoxication." AE XXXI at 5.

[24] *See generally United States v. Bailey*, 444 U.S. 394, 403 (1980) (explaining that "[i]n a general sense, ... 'knowledge' corresponds loosely with the concept of general intent") (citation omitted).

[25] "Where required instructional error is preserved, we test for harmlessness. *See, e.g.*, Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2012); [*United States v.* ]*Killion*, 75 M.J. [209,] 214 [(C.A.A.F. 2016)]; *see also Neder v. United States*, 527 U.S. 1, 9 . . . (1999) (holding that an objected-to jury instruction omitting an element of the offense is constitutional error tested for harmlessness beyond a reasonable doubt)." *United States v. Davis*, 76 M.J. 224, 229 (C.A.A.F. 2017). *See also United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006) (instructional error with constitutional implications is prejudicial unless it is harmless beyond a reasonable doubt).

knowledge, the instruction itself would have changed only slightly had the military judge also applied it to the third element of fleeing.

The defense theory throughout trial was that the appellant did not know that Officer JB was attempting to apprehend him, and that he was unaware he was fleeing apprehension. The appellant argued his intoxication level was such that he had no recollection of the events described by Officer JB—and this caused a reasonable doubt regarding his ability to form the intent to flee. While the voluntary intoxication instruction here was imperfect if specific intent applied, the members were still clearly informed that the appellant's "ordinary thought process may be materially affected" by his alcohol consumption and this intoxication evidence could "cause [them] to have reasonable doubt that the [appellant] knew Officer [JB] was attempting to apprehend him."[26]

An additional instruction that the appellant's voluntary intoxication could have also impacted his ability to form the specific intent to flee is nearly redundant under these facts. For the appellant to prevail, the members would have had to believe he was so intoxicated that he did not know Officer JB was attempting to apprehend him *and* that his intoxication was such that he was unable to form the intent to flee. Thus, the members properly understood that alcohol intoxication could have impacted the entire offense despite not being directly instructed on the third element's specific intent to flee.

Finally, the government's evidence was overwhelming. This court-martial was the rare case where the members heard not only the testimony of the witnesses, but the appellant's testimony. They viewed the appellant's NCIS interrogation and the police dashboard camera footage of Officer JB's attempt to apprehend the appellant, where the members could judge the appellant's interaction with Officer JB for themselves. We are therefore satisfied beyond a reasonable doubt that if the omitted specific intent element was error, the government's case was "supported by overwhelming evidence, such that the jury verdict would have been the same absent the error[.]" *Neder v. United States*, 527 U.S. 1, 17 (1999).

## C. Continuance denial

Next, the appellant alleges the military judge erred by denying a continuance to accommodate his desired expert witness's trial availability.

We review a military judge's decision to grant or deny a continuance for an abuse of discretion. *United States v. Miller*, 47 M.J. 352, 358 (C.A.A.F 1997). An abuse of discretion "requires more than just [a court's]

---

[26] Record at 402.

disagreement with the military judge's decision." *United States v. Bess*, 75 M.J. 70, 73 (C.A.A.F. 2016) (citation omitted). In determining whether a military judge abused her discretion in granting a continuance, appellate courts consider the following factors: "surprise, nature of any evidence involved, timeliness of the request, substitute testimony or evidence, availability of witness or evidence requested, length of continuance, prejudice to opponent, moving party received prior continuances, good faith of moving party, use of reasonable diligence by moving party, possible impact on verdict, and prior notice." *United States v. Wiest*, 59 M.J. 276, 279 (C.A.A.F. 2004) (quoting *Miller*, 47 M.J. at 358).

Here the military judge considered all these factors in her written ruling, and the weight of the factors fell in favor of the government.[27]

*1. Surprise, prior continuances, and use of reasonable diligence by moving party*

This case had several continuances, one granted at defense's request in July 2015 to shift the case to 14 November 2015 to accommodate witnesses, including experts. The defense expert consultant at issue had been granted by the government in June 2015; but the defense waited until 27 October 2015—two weeks before trial—to request him as an expert witness, despite the military judge discussing this issue with counsel prior to continuing the trial dates in July. After the CA denied the expert witness, the defense filed a continuance request on 2 November 2015. Therefore, the expert's unavailability was unanticipated given the agreed-upon final trial dates and the late motion to compel the witness; and thus a last minute surprise to the government, military judge, and victim's legal counsel (VLC).

*2. Nature of the evidence involved, possible impact on the verdict, and substitute evidence or testimony*

The essence of the defense expert's testimony was to discuss intoxication and memory loss—testimony that the defense conceded could be provided by other experts. At trial, the defense was able to elicit similar memory loss testimony from the government's toxicologist—though it was information the members likely already understood given their common sense and knowledge of the ways of the world.

*3. Timeliness of the request*

The continuance request was filed less than two weeks before trial as part of a motion to compel the expert witness and litigated nine days before trial, despite the expert consultant having been granted four months previously.

---

[27] AE XVI at 4-5.

*4. Availability of witnesses and prejudice to the opponent*

The appellant requested only one expert witness, while the government prepared and made arrangements for 26 witnesses, including three expert witnesses. Delaying the trial until 16-24 December 2015 or 18-22 January 2016 as requested by the defense, would have severely impacted the government's case as several witnesses would have become unavailable while the appellant remained in pretrial confinement. Additionally, the VLC opposed the continuance due to the emotional strain on 1stLt MD's widow.

*5. Good faith of the moving party and prior notice*

While the appellant has not demonstrated any reason to question his good faith, denying the continuance did not truly present a notice issue for his counsel because the case had been in litigation for nearly a year and they were well aware of the trial dates.

While the appellant contends that the expert would have touched directly on the issue of whether the appellant knew a police officer was attempting to arrest him, he presents no evidence of how this lack of testimony impacted the trial. The defense was able to use the government's expert to elicit the memory and intoxication testimony they desired, which allowed them to present their defense theory regarding the impact of alcohol, memory, and blackouts on the appellant.

Here, the *Miller* factors weigh substantially in favor of the government, making the military judge's decision to deny the continuance request reasonable and not an abuse of discretion.

**D. Denial of SSgt N as a defense witness**

The appellant also contends the military judge erred by denying SSgt N as a character witness.

A military judge's decision to deny a witness is reviewed for an abuse of discretion. *United States v. Rockwood*, 52 M.J. 98, 104 (C.A.A.F 1999). It is well settled that each party at trial is generally entitled to the production of a witness whose testimony is relevant, material, necessary, and not cumulative. R.C.M. 703(b)(1). *See also United States v. Williams*, 3 M.J. 239 (C.M.A. 1977).

The defense asked for three character witnesses: Gunnery Sergeant (GySgt) K, SSgt N, and Corporal (Cpl) C. The military judge granted Cpl C, but found GySgt K and SSgt N to be cumulative because they were both staff non-commissioned officers (SNCOs) who observed the appellant for the same amount of time and from similar vantage points (platoon and company sergeants) given the appellant's relatively brief service. The defense was unable to articulate a meaningful difference between the witnesses and,

instead, argued that the seriousness of the charged offenses warranted production of all three witnesses. The military judge asked the defense which of the two they preferred given their substantial overlap, and they chose GySgt K. Therefore, the military judge ordered him produced and found SSgt N cumulative. Because the TDC was unable to articulate a material difference between the two SNCOs and their testimony would have been virtually identical, the military judge's determination that SSgt N's testimony was cumulative was reasonable and not an abuse of discretion.

**E. UCI**

The appellant argues that the military judge erred in finding that the facts did not establish apparent UCI despite an article in the Marine Corps Times where General Neller referenced the appellant's case. Even assuming, *arguendo*, this was error, we nevertheless find the remedies provided by the military judge—under the rubric of pretrial publicity—sufficiently protected the proceedings against any possible UCI.

*1. The claim of apparent UCI*

At trial, and on appeal, the appellant argues that his trial was infected by apparent UCI because the incoming Commandant of the Marine Corps made comments in the Marine Corps Times and Washington Post regarding the appellant's case by name, close in time to the appellant's court-martial. The parties agreed to postpone further discussion of UCI until voir dire. The government "agree[d] with [civilian defense counsel]. This should probably be an area in which we explore on voir dire. . . . And that should, I think, ameliorate or alleviate any concerns of UCI."[28]

*2. The law*

UCI has often been referred to as "'the mortal enemy of military justice.'" *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004) (quoting *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986)). Article 37(a), UCMJ, states in relevant part: "No person subject to this chapter may attempt to coerce or. . . influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case . . . ."

"Congress and this court are concerned not only with eliminating actual unlawful command influence, but also with 'eliminating even the appearance of unlawful command influence at courts-martial.'" *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006) (quoting *United States v. Rosser*, 6 M.J. 267, 271 (C.M.A. 1979)).

---

[28] Record at 35.

A military judge has the inherent authority to intervene and protect the court-martial from the effects of apparent UCI because the mere appearance of UCI may be "'as devastating to the military justice system as the actual manipulation of any given trial.'" *United States v. Ayers*, 54 M.J. 85, 94-95 (C.A.A.F. 2000) (quoting *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991)). "[O]nce unlawful command influence is raised, 'we believe it incumbent on the military judge to act in the spirit of the Code by avoiding even the appearance of evil in his courtroom and by establishing the confidence of the general public in the fairness of the court-martial proceedings.'" *United States v. Stoneman*, 57 M.J. 35, 42 (C.A.A.F. 2002) (quoting *Rosser*, 6 M.J. at 271).

The defense has the burden of raising the issue of actual or apparent UCI. *United States v. Reed*, 65 M.J. 487, 488 (C.A.A.F. 2008) (citing *United States v. Biagase,* 50 M.J. 143, 150 (C.A.A.F. 1999)). On appeal the appellant must present "some evidence" of UCI, showing (1) "facts which, if true, constitute unlawful command influence," (2) "the proceedings were unfair," and (3) "unlawful command influence was the cause of the unfairness." *Biagase*, 50 M.J. at 150 (citations omitted).

"The test for actual unlawful command influence is, figuratively speaking, 'whether the convening authority has been brought into the deliberation room.'" *United States v. Allen*, 31 M.J. 572, 590 (N.M.C.M.R. 1990) (quoting *United States v. Grady*, 15 M.J. 275 (C.M.A. 1982)).

The test for apparent UCI is objective. "We focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." *Lewis*, 63 M.J. at 415. An appearance of UCI arises "where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.*

Once some evidence has raised the specter of UCI, "the government bears the burden of proving beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence.'" *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F. 2017) (citing *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) and *Biagase*, 50 M.J. at 151). If the government cannot meet this initial burden, then the government must prove beyond a reasonable doubt "that the unlawful command influence did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding." *Id.* (citations and internal quotation marks omitted) (alteration in original).

"'Where the issue of unlawful command influence is litigated on the record, the military judge's findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that [the] Court reviews *de novo*.'" *Reed*, 65 M.J. at 488 (C.A.A.F. 2008) (quoting *United States v. Wallace,* 39 M.J. 284, 286 (C.M.A. 1994)). We review a military judge's remedy for unlawful command influence for an abuse of discretion. *United States v. Douglas*, 68 M.J. 349, 354 (C.A.A.F. 2010); *Gore*, 60 M.J. at 187.

*3. The military judge's ruling*

The defense focused solely on the appearance of unlawful command influence, and ultimately the military judge did not need to make a determination on either actual or apparent unlawful command influence. She viewed the issue as one of pretrial publicity and the parties agreed the best way to handle the potential issue was through voir dire. During voir dire, the parties and military judge were satisfied that any possible UCI would have no effect on the proceedings given the members' lack of familiarity with the articles at issue. No challenges were made on the basis of UCI.

Thus the issue discussed in motions and tested for during voir dire never ultimately materialized; and the appellant never met his burden under *Boyce* or *Biagase* to present some evidence of UCI. The appellant offers no additional information and no new argument on the UCI issue on appeal; therefore we conclude there was no UCI.

**F. Denial of challenge to LtCol D**

The appellant next avers that the military judge erred by denying his challenge against LtCol D serving as a panel member.

R.C.M. 912(f)(1)(N) provides that a court-martial panel member shall be excused for cause whenever it appears the member "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." This rule applies to both actual and implied bias. *United States v. Daulton*, 45 M.J. 212, 216-17 (C.A.A.F. 1996).

"The military judge is also mandated to err on the side of granting a challenge. This is what is meant by the liberal grant mandate." *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015) (citation omitted). Here, the military judge applied the liberal grant mandate but denied the challenge for cause for LtCol D. She denied there was any actual bias and ruled there was no implied bias because there was "no reason to believe that a person in the same position as he would be prejudiced."[29] We agree.

---

[29] *Id.* at 113.

During group voir dire, LtCol D noted that he had spoken with the trial counsel (TC) a few times on different cases, that he knew the CA personally—but not his views on military justice—and that the CA was his reviewing officer (RO). He further explained that he was an executive officer (XO) who regularly dealt with military justice matters, and that he had heard about the appellant's case a few months earlier when he had checked in. The defense challenged him, arguing,

> [A]s to Lieutenant Colonel [D], the close working relationship with the government, in this particular case. Also, his role in the – as an XO of his particular unit in military justice matters. I think he indicated that he works extensively with someone that's an underling to [the TC]. We believe that under the Liberal Grant rules, that this particular individual should be excused for cause.[30]

The military judge found that LtCol D's experience working military justice cases with a TC unrelated to the appellant's case, and his limited interaction with the acting TC, would not improperly inform his decisions in court:

> [H]e said that he works with Major P, who is the Senior Trial Counsel up at Legal Team Delta; and that she, almost exclusively handles the cases he deals with at 1st Marines. And that he has come across [the TC] a couple of times up there, but certainly, he didn't receive any advice from [the TC], and he asserted that – the fact that [the TC] was a part of this case wouldn't influence him at all.

> So as far as actual bias, certainly, there's nothing to suggest that he's actually biased as to any question of fact in this case. As far as implied bias . . . [h]e is currently dealing with some military justice items, but . . . [M]arines, especially once they get to the rank of lieutenant colonel, generally have some involvement in disciplinary proceedings . . . and that, in and of itself, isn't a reason to believe that he would be biased for one side or the other, or that the public would perceive him to be unfair[.][31]

---

[30] *Id*. at 111-12. The defense did not object based on LtCol D's RO relationship with the CA because LtCol D had "done a fine job explaining [his] relationship with the convening authority in this case. I don't have any question about that." *Id*. at 94.

[31] *Id*. at 113-14.

*1. Actual bias*

"The test for actual bias is whether any bias is such that it will not yield to the evidence presented and the judge's instructions." *United States v. Terry*, 64 M.J. 295, 302 (C.A.A.F. 2007) (citations and internal quotation marks omitted). "Military judges are afforded a high degree of deference on rulings involving actual bias[,]" *United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015), and will only be overturned for an abuse of discretion, *United States v. Reynolds*, 23 M.J. 292, 294 (C.M.A. 1987). The military judge's ability to watch the challenged member's demeanor during the voir dire process makes him specially situated to make factual determinations when assessing actual bias. *Terry*, 64 M.J. at 302.

Here, the defense did not challenge the member for actual bias. The military judge noted that there was no actual bias because the member did not have any true nexus to the case. The military judge did not abuse her discretion.

*2. Implied bias*

"Implied bias exists when most people in the same position as the court member would be prejudiced. It is evaluated objectively under the totality of the circumstances and through the eyes of the public, reviewing the perception or appearance of fairness of the military justice system. The core of that objective test is the consideration of the public's perception of fairness in having a particular member as part of the court-martial panel." *United States v. Dockery*, 76 M.J. 91, 96, (C.A.A.F. 2017) (citations and internal quotation marks omitted).

"We review implied bias challenges pursuant to a standard that is less deferential than abuse of discretion, but more deferential than de novo review. Whereas a military judge can observe the demeanor of the court members in order to determine credibility in the case of actual bias, cases of implied bias are based upon an objective test and therefore the military judge is given less deference in such cases." *Peters*, 74 M.J. at 33 (citations and internal quotation marks omitted).

To a disinterested observer, there was nothing LtCol D said to indicate he would be partial to the government due to his experience in military justice matters and his few inconsequential interactions with the TC and the CA.

The military judge must consider the totality of the factual circumstances in deciding to grant a challenge under the implied bias test. *United States v. Strand,* 59 M.J. 455, 459 (C.A.A.F. 2004). But, even considering the totality of the circumstances and the liberal grant mandate, the military judge's denial of the challenge for cause for LtCol D was not a close call. Anyone in the same position as the member would not be prejudiced, and leaving LtCol D on the

panel did no injury to the public's perception of fairness of the military justice system.

Consequently, the military judge did not abuse her discretion in failing to find implied bias. Although less deference is given for challenges involving implied, vice actual, bias, a "military judge's ruling on a challenge for cause is [still] given great deference." *United States v. Rolle*, 53 M.J. 187, 191 (C.A.A.F. 2000) (citation and internal quotation marks omitted). We grant that deference here.

## G. Unreasonable multiplication of charges

Finally, the appellant alleges the military judge erred in denying his motion to merge Charges II, III, and IV in sentencing for unreasonable multiplication of charges.[32]

We review a military judge's decision to deny relief for unreasonable multiplication of charges for an abuse of discretion. *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012).

Like the appellant, we turn to *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001) for the factors guiding our analysis:

> (1) Did the appellant object at trial that there was an unreasonable multiplication of charges and/or specifications?;
>
> (2) Is each charge and specification aimed at distinctly separate criminal acts?;
>
> (3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?;
>
> (4) Does the number of charges and specifications [unreasonably] increase the appellant's punitive exposure?; and
>
> (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

First, the appellant preserved his objection for unreasonable multiplication at trial.

---

[32] The appellant lists the AOE as an error in "failing to find that Charge III and IV should be merged" in his header, which are the Article 111 and 119, UCMJ charges. Appellant's Brief at 34-35. However, it is clear he is actually referring to the same discussion had with the trial judge prior to sentencing regarding Charges II, III, and IV (the Article 95, 111, and 119 offenses.) Record at 445-48. As noted in the appellant's and government's briefs, it is this issue preserved for appeal, so we discuss it instead.

Second, we consider whether the three charges (Article 95, Article 111, and Article 119, UCMJ) refer to separate and distinct acts.[33] The appellant argues that Charge IV's involuntary manslaughter alleged a continuous course of conduct broad enough to include Charge II's fleeing apprehension and Charge III's drunk driving. However, Charge II specifically addresses the appellant's conduct regarding his interaction with Officer JB—specifically, the speeding away prior to the collision; whereas Charge III encompasses other drunk and reckless driving that same day—including to and from the on-base party and in front of the barracks prior to the encounter with Officer JB. Charge IV focuses on unlawful killing through culpable negligence, which requires only a careless act—which here could have been drunk or reckless driving—but also could have been the inattentive driving described in the defense's theory of the case. While all three offenses are related since they occurred on the same evening, they are directed at distinctly separate acts and separate societal concerns.

Third, while the government certainly could have charged only Charge IV, involuntary manslaughter, they were not limited. The government's theory relied on all three wrongs charged; had the appellant made different choices regarding the drunk driving or fleeing apprehension, the involuntary manslaughter may have never happened. On these facts, charging the offenses separately does not misrepresent or exaggerate the appellant's criminality.

Fourth, the number of charges did not unreasonably increase the appellant's punitive exposure. The maximum confinement for all three charges was 14 years, 6 months, however the maximum confinement for Charge IV's involuntary manslaughter alone was 10 years. Merging Charge II and Charge III for sentencing would have reduced possible confinement by only one year. Admittedly, Charge III's drunken driving charge did contain

---

[33] Charge II: In that [the appellant] . . . did, aboard Marine Corps Base Camp Pendleton, California, on or about 7 November 2014, flee apprehension by Provost Marshall Officer [JB], an armed force policeman, a person authorized to apprehend [the appellant].

Charge III: In that [the appellant] . . . did, aboard Marine Corps Base Camp Pendleton, California, on or about 7 November 2014, operate a vehicle, to wit: a pickup truck, while drunk, in a wanton manner by fleeing a pursuing law enforcement vehicle at an excessive speed, and did thereby cause said vehicle to strike and injure 1stLt [MD].

Charge IV: In that [the appellant] . . . did, did, aboard Marine Corps Base Camp Pendleton, California, on or about 7 November 2014, by culpable negligence, unlawfully kill 1stLt [MD], by striking 1stLt [MD]'s vehicle with [the appellant's] vehicle.

an escalator clause of an additional year of confinement due to the injury caused to 1stLt MD. But, while we agree with the appellant that the escalator clause makes this determination a closer call, we do not find the charging scheme to *unfairly* increase his punitive exposure.

Fifth, there is no allegation, or evidence, of prosecutorial overreach or abuse in charging by the appellant at trial or on appeal. The appellant drank underage, drove his truck on base at nearly twice the speed limit, and fled from apprehension before tragically killing 1stLt MD. Given those facts, nothing about the government's charging scheme demonstrates prosecutorial overreach or abuse.

For these reasons, we find the military judge did not abuse her discretion in denying the appellant's motion to dismiss or merge for sentencing any charge or specification as an unreasonable multiplication of charges.

### III. CONCLUSION

The findings and the sentence are affirmed.

Senior Judge MARKS and Senior Judge HUTCHISON concur.

For the Court

R.H. TROIDL
Clerk of Court